[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 14, 2004
THOMAS K. KAHN
CLERK

_____

No. 02-13348

_____

D. C. Docket No. 98-00109-CV-6

TRACY MILLER,

Plaintiff-Appellant,

UNITED STATES OF AMERICA,

Intervenor,

versus

RONALD KING,

Defendant-Appellee,

WAYNE GARNER,
THE STATE OF GEORGIA,
THE GEORGIA DEPARTMENT OF
CORRECTIONS, JOHNNY SIKES,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(September 14, 2004)**

Before CARNES, HULL and HILL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Tracy Miller ("Miller"), a paraplegic state prisoner, appeals the grant of summary judgment on his Eighth-Amendment claims brought under 28 U.S.C. § 1983 and his disability-discrimination claims brought under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("ADA").

After review and oral argument, we reverse as to Miller's: (1) Eighth-Amendment claims under § 1983 for monetary damages against defendant Sikes in his individual capacity; (2) Eighth-Amendment claims under § 1983 for injunctive relief against defendant Sikes in his official capacity; and (3) ADA claims for injunctive relief against defendant Sikes in his official capacity. We affirm as to Miller's ADA claims for monetary damages as to all defendants and as to all other claims against all defendants.

## I. BACKGROUND

Miller is a paraplegic, wheelchair-bound inmate at Georgia State Prison ("GSP") in Reidsville, Georgia. Miller suffers from complete paralysis in his right leg, partial paralysis in his left leg, and a neurogenic bladder condition that causes urinary incontinence. At GSP, Miller is housed in disciplinary isolation in the "K-Building," which is designated a "high maximum" security section of the prison. As a result of more than 180 disciplinary reports, Miller has been held in isolation in the K-Building since at least 1998, and is due to remain in isolation for a total

of more than eight years. Able-bodied inmates in disciplinary isolation are housed in less stringent units than the "high maximum" security K-Building. Because K-Building cells are so small and not accommodated for the wheelchair-bound, prison policy calls for beds to be removed daily so that the wheelchair-bound inmates have some minimal area within which to move around their cells.[1]

## A.      Complaint

Miller originally filed this action under 42 U.S.C. § 1983 against Ronald King, the Hearing Officer for the Office of Inmate Discipline at GSP, and Wayne Garner, Commissioner of the Georgia Department of Corrections ("GDOC"), in their official and individual capacities. The original complaint alleged that the defendants had deprived Miller of various due-process rights under the Fourteenth Amendment, including the right to present witnesses in his disciplinary hearings. Miller also alleged that the defendants had placed him in isolation because he is disabled and in retaliation for his filing suits.

Miller subsequently amended his complaint to add as defendants the State of Georgia, the GDOC, and GSP Warden Johnny Sikes, in his official and

---

[1]The defendants dispute Miller's allegation that the K-Building is not wheelchair-accessible. However, in reviewing a grant of summary judgment, we must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1186-87 (11th Cir. 1999). Thus, we outline Miller's version of the conditions and events at GSP.

individual capacities. Miller also added disability-discrimination claims under Title II of the ADA, retaliation claims under the First Amendment, and cruel-and-unusual-punishment claims under the Eighth Amendment. Miller's complaint (as amended, the "Complaint") sought monetary and injunctive relief.

Regarding his Eighth-Amendment and ADA claims, Miller's Complaint essentially makes the following claims against the defendants: (1) that there is no room in his small cell for him to maneuver his wheelchair, making him immobile and restrained for extended periods of time and that this problem is exacerbated by GSP staff's failure to remove his bed from his cell daily, as prison policy requires for wheelchair-bound inmates; (2) that the showers and toilets in the K-Building are not wheelchair-accessible, that he has been denied the opportunity to bathe regularly and to obtain basic hygiene, and that GSP staff have not provided him necessary urine catheters or assistance in using portable toilets, resulting in Miller's urination and defecation on himself; and (3) that GSP officials and staff have ignored his medical complaints, failed to provide him with rudimentary medical devices required for his paraplegic condition, including leg braces, orthopedic shoes, a wheelchair-accessible van, and wheelchair repairs, and failed to provide him with required medical care, including physical therapy, occupational therapy, and medical evaluation for his spinal condition, resulting in

bed sores, serious atrophy, and deterioration of his spinal condition. As additional ADA claims, Miller asserts that he has been denied basic privileges provided to able-bodied inmates in isolation, including removal from isolation for one day after each thirty-day isolation period, and participation in "yard call" and "gym call" during each such removal day.[2]

Miller alleges that GSP officials and staff, including Warden Sikes personally, were aware of his paraplegic condition, the inhumane conditions of his confinement and his serious medical needs, and were deliberately indifferent to those conditions and needs. On these bases, Miller seeks monetary damages and injunctive relief under § 1983 and Title II of the ADA.

## B.    Preliminary Injunction Hearing

Miller filed numerous motions for emergency preliminary injunctions. The magistrate judge conducted a hearing at which Miller, several inmates, and prison officials testified. We review that evidence because Miller relies on it in this appeal.

During the hearing, Clarence Downs, a GSP prisoner housed in the K-Building with Miller, testified that he had observed correctional officers using

---

[2]While Miller makes voluminous claims, many of which are unintelligible or nonsensical, we focus on the claims by Miller that are intelligible and appear potentially viable.

excessive force against Miller, that officers at times shut off the water to Miller's cell for days at a time, that Miller's cell was not large enough to maneuver a wheelchair, and that prison staff did not remove beds from cells during the day to make the cells wheelchair-accessible. The magistrate judge admitted into evidence a letter from J. Philip Ferraro, GDOC Assistant Director of Legal Services, a copy of which was provided to Warden Sikes, stating that "the beds for disabled prisoners in restricted quarters are removed during the day to ensure they have enough room to maneuver their wheelchairs in their cells." During the hearing, Miller emphasized that his bed was not removed from his cell daily as required by GDOC policies.

Dr. Carolyn Mailloux, the GSP medical director, testified that Miller was able to stand on his own and maneuver for short periods of time, and that while Miller would not necessarily require a "wheelchair with legs," it would be beneficial to him. Although Dr. Mailloux requested various medical consultations and treatments for Miller, Miller never received the prescribed consultations or treatments because each time either Miller refused or GSP Utilization Management did not approve the visits. Dr. Mailloux acknowledged that Miller had experienced some muscle atrophy. However, Dr. Mailloux testified that medical staff examined Miller shortly before or after he was placed in disciplinary

6

isolation, that Miller's cell was wheelchair-accessible, that she was not aware that the prison staff had ever refused Miller medical treatment, and that Miller's life was not in imminent danger due to lack of medical treatment at the prison. She further testified that Miller had not received physical therapy because he refused to go to a prerequisite consultation, and that Miller could travel in a regular van without any special accommodations.

While able-bodied inmates in isolation are housed elsewhere, Warden Sikes testified that Miller was housed in the K-Building because of its wheelchair accessibility to the shower and the yard. Sikes testified that Miller was moved to the K-Building from the infirmary because he proved a continual distraction to both staff and inmates in the infirmary, and that the K-Building's accommodations were reasonable under those circumstances. According to Warden Sikes, there was no other place where other isolation inmates were housed that would be wheelchair-accessible for Miller. With regard to Miller's isolation time, Warden Sikes acknowledged that Miller on one occasion had not been removed after thirty days of isolation, but testified that the failure to remove Miller was due to an oversight on that single occasion.

Reginald Ford, a correctional officer at GSP, testified that on one occasion he responded to Miller's complaint of a back injury, but the medical staff did not

respond immediately. GSP staff physician Dr. Thomas Lowry testified that he had on one occasion attempted to treat Miller for back pain, but Miller refused. Dr. Lowry testified that Miller met the criteria for an assisted-living facility at August State Medical Prison, but that, to his knowledge, Miller had received reasonable medical care at GSP.

Next, Visol Smith, a correctional unit manager at GSP, testified that the medical staff had evaluated Miller after he complained about his back injury. According to Smith, prison staff cleaned Miller's cell and brought food trays to his bed, and because the staff was able to accommodate Miller's disability, the K-Building was appropriate housing for Miller. Smith did testify, however, that the bed was not removed from Miller's cell on a daily basis to allow Miller more room for his wheelchair, although there were plans to begin doing so.

Finally, defendant King, the GSP hearing officer, testified that most inmates are restored privileges and returned to the dorms when they are taken out of isolation status. Miller, on the other hand, continued to live in the K-Building upon removal from isolation status due to his poor behavior.

## C. Denial of Preliminary Injunction

After the hearing, the magistrate judge issued a report recommending that the district court deny Miller's motion for a preliminary injunction. The

magistrate judge concluded that Miller arguably demonstrated a likelihood of success on the merits of his Eighth-Amendment claims that GDOC staff "knowingly failed to remove [Miller's] bed from his cell each day as recommended by the Legal Division of the GDOC and failed to change his status to allow for complete general population privileges for one day following thirty days of disciplinary isolation." The magistrate judge found, however, that Miller failed to establish irreparable harm, as required for a preliminary injunction.

With regard to Miller's Eighth-Amendment claims, the magistrate judge concluded, on the basis of Dr. Mailloux's testimony, that Miller failed to demonstrate that the defendants were deliberately indifferent to his serious medical needs. Specifically, the magistrate judge's report stated:

> Mailloux testified that Plaintiff has been provided adequate medical care and that there are no serious medical needs of Plaintiff which have not been accommodated. Additionally, Dr. Mailloux explained that Plaintiff has refused medical care on several occasions. Some of these incidents include Plaintiff refusing to go to consultative appointments at Augusta Medical State Prison because he would not be transported in a vehicle which was wheelchair accessible. Dr. Mailloux explained that Plaintiff's medical condition is such that he does not need to be transported in a wheelchair accessible van.[3]

---

[3]Part of the factual dispute in this case appears to be whether a wheelchair-accessible van is necessary to transport Miller or whether he can be transported safely by strapping him into a regular passenger seat in a van.

Next, the magistrate judge found that: (1) the prison's actions in not permitting Miller to reenter the general population were reasonable due to Miller's aggressive behavior and his defenselessness to attacks from other inmates; (2) Miller failed to demonstrate a likelihood of success on the merits of his due-process claim; and (3) any harm that Miller might suffer in the future was not imminent. The magistrate judge refused to recommend that Miller be transferred to another facility, such as Augusta State Medical Prison. Over Miller's objections, the district court adopted the magistrate judge's report and denied Miller's motion for a preliminary injunction.

## D.  Summary Judgment for Garner and Sikes

Subsequently, all defendants jointly moved for summary judgment, and submitted the affidavits of King, Sikes, and Dr. Mailloux. In his affidavit, Warden Sikes stated that he was not medically trained, that "sick call requests" were routed directly to GSP medical staff, and that he was never involved in any decision regarding Miller's diagnosis or care. Moreover, Warden Sikes stated that he did not discriminate against Miller due to any disability, and that Miller was moved to disciplinary housing because he "virtually destroyed his hospital cell." In her affidavit, Dr. Mailloux stated that the medical care received by Miller was consistent with contemporary medical standards, and that Miller's housing

assignment was not contrary to his medical condition or needs.  Dr. Mailloux further stated:

> While inmate Miller does have medical limitations, his condition is not such that he appears to be disabled in a major life activity.  While he uses a wheelchair at times, he also has been observed standing and I have seen reports of occasions when he has caused considerable damage to his cell, all of which could not have been physically possible if he were indeed unable to ambulate as he sometimes contends.

In opposition to the defendants' motion for summary judgment, Miller submitted two briefs, his own affidavit, as well as the affidavits of inmates Dwight Benton and Tony Goodman.  Miller also filed his own motion for summary judgment.

In his affidavit, Benton, a disabled inmate at GSP, attested that the K-Building cells were not wheelchair-accessible.  Benton averred that he is a paralyzed inmate at GSP, that he is also housed in the K-Building, that Miller has no access to occupational therapy, physical therapy, showers, or the library, and that Miller's cell is not accommodated and lacks "wheelchair space."  According to Benton, Miller was harassed on a daily basis and never leaves his cell.  Benton never observed Miller standing without the use of his "devices."  In his affidavit, Goodman, another disabled inmate at GSP, also stated that the cell block where he and Miller are housed is not wheelchair-accessible.  According to Goodman,

11

Miller has no way to shower, and no access to recreation, physical therapy, or occupational therapy.[4]

In his affidavit, Miller attested that he is paralyzed completely in his right leg and partially in his left leg due to gunshot wounds. Miller filed a letter from Dr. Mailloux in which she acknowledged that Miller is a "partially paralyzed inmate."[5] Miller testified that he is denied access to the gym, kitchen call, required medical treatment, physical therapy, occupational therapy, and urine catheters. According to Miller's affidavit, his bed is never removed from his cell, he is denied wheelchair repairs and orthopedic shoes, his legs swell, and his back hurts. Miller asks for a bed that "works" so that he can elevate his feet and legs to prevent continuous "dropfoot, swelling."

The magistrate judge's report recommended (1) that summary judgment be granted to defendants Garner and Sikes but not the other defendants, and (2) that all of Miller's motions be denied. Over Miller's objections, the district court adopted the magistrate judge's report and granted summary judgment to Sikes and

---

[4]In connection with an earlier motion, Miller presented the affidavit of Ernest Howard, another disabled inmate in the K-Building, who stated that the cells are too small to maneuver a wheelchair and that the showers are not safe for disabled inmates.

[5]Dr. Mailloux also stated in the letter that on many occasions Miller, after requesting medical evaluation, either refused it outright or refused to be handcuffed and transported for evaluation.

Garner, but otherwise denied summary judgment as to defendants King, the State of Georgia, and the GDOC. The parties then consented to the jurisdiction of the magistrate judge.

**E.    Summary Judgment on ADA Claims**

Subsequently, defendants King, the State of Georgia, and the GDOC filed a supplemental motion for partial summary judgment, which the magistrate judge granted. Over Miller's objections, the magistrate judge concluded that: (1) Miller's ADA claims against the State of Georgia and the GDOC were precluded by the Eleventh Amendment;[6] (2) public officials, such as King, in their individual capacities are not subject to ADA liability; and (3) Miller's only claims remaining for trial were against King for retaliation and due-process violations in prison disciplinary hearings.

**F.    Jury Trial on Due-Process and Retaliation Claims Against King**

The magistrate judge then held a jury trial on Miller's due-process and retaliation claims against defendant King as the GSP hearing officer. The jury returned a verdict in favor of King. The magistrate judge denied Miller's motions for a new trial and judgment as a matter of law.

_____

[6]Although the magistrate judge granted summary judgment on all ADA claims against the State of Georgia and GDOC, the magistrate judge's order addressed only Miller's ADA claims for monetary damages and not his ADA claims for injunctive relief.

**G.    Appeal**

On appeal Miller argues that: (1) the jury's verdict on his due-process and retaliation claims was not supported by substantial evidence; (2) the magistrate judge improperly conducted voir dire and lacked jurisdiction; (3) the magistrate judge and district court improperly denied Miller's motions for preliminary injunctions; and (4) the magistrate judge and district court erred in granting summary judgment to the defendants on his Eighth-Amendment claims under § 1983 and his ADA claims under Title II.  Except for the Eighth-Amendment and ADA claims, these arguments lack merit and warrant no further discussion.[7]  We thus turn to the grant of summary judgment to all defendants on Miller's Eighth-Amendment and ADA claims.

## II.  STANDARD OF REVIEW

"We review the district court's rulings on motions for summary judgment <u>de novo</u>, applying the same legal standards that bound the district court."  <u>Jackson v. BellSouth Telecomm.</u>, 372 F.3d 1250, 1279 (11th Cir. 2004).  This Court, like the trial court, must view all evidence and all factual inferences therefrom in the light

---

[7]On appeal, Miller also contends that he is entitled to proceed under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).  This claim was never raised in the district court, and thus we do not consider it for the first time on appeal.  <u>See</u> <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1274 n.5 (11th Cir. 2004).

most favorable to the non-moving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Jackson, 372 F.3d at 1279-80 (quoting Fed. R. Civ. P. 56(c)).  There is no genuine issue for trial if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)) (citation omitted); Jackson, 372 F.3d at 1979-80.

### III.  DISCUSSION

Miller challenges the grant of summary judgment to all defendants on his Eighth-Amendment and ADA claims.  Specifically, Miller argues, inter alia, that: (1) genuine issues of material fact preclude summary judgment on his Eighth-Amendment claims against Warden Sikes under § 1983; (2) he is entitled to prospective injunctive relief under the ADA; (3) Congress validly abrogated the

15

Eleventh Amendment in Title II of the ADA, allowing him to recover monetary damages from the State of Georgia and the GDOC for ADA violations; and (4) the ADA provides for suits against State officials in their individual capacities, allowing his ADA claims against the individual defendants to go forward.

We affirm the district court's grant of summary judgment in favor of the defendants except for Miller's: (1) § 1983 Eighth-Amendment claims for monetary damages against defendant Sikes individually; (2) § 1983 Eighth-Amendment claims for injunctive relief against defendant Sikes in his official capacity as Warden of GSP; and (3) ADA claims for injunctive relief against Sikes in his official capacity as Warden of GSP.[8] We explain why these claims survive summary judgment and why against only defendant Sikes.

## A.    Eighth-Amendment Claims Under § 1983

1.    Proper Defendants Under § 1983

When filing a suit under 42 U.S.C. § 1983, a prisoner is limited with respect to whom he or she may sue. A plaintiff may not bring a § 1983 action for monetary damages against the State of Georgia, the GDOC, or state officials in

---

[8]Miller wants to pursue his Eighth-Amendment and ADA claims against defendants Garner and King as well, but we conclude that his evidence does not create factual issues to survive summary judgment as against Garner and King. Miller's Complaint, read liberally, attempts to state an equal-protection claim under the Fourteenth Amendment, but Miller has produced insufficient evidence to create a dispute of material fact on this claim as well.

their official capacities.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109

S. Ct. 2304, 2312 (1989); Edwards v. Wallace Community College, 49 F.3d 1517,

1524 (11th Cir. 1995).[9]  Further, the Eleventh Amendment bars a prisoner's

§ 1983 action against the State of Georgia and the GDOC for both monetary

damages and injunctive relief.  Stevens v. Gay, 864 F.2d 113, 114-15 (11th Cir.

1989).  Accordingly, we affirm the grant of summary judgment to the State of

Georgia and the GDOC on Miller's § 1983 claims.

A prisoner, however, may bring a § 1983 action against state officials in

their official capacities, but only for prospective, injunctive relief.  Will, 491 U.S.

at 71 n.10, 109 S. Ct. at 2312 n.10 (citing Kentucky v. Graham, 473 U.S. 159, 167

n.14, 105 S. Ct. 3099, 3106 n.14 (1985)); Ex parte Young, 209 U.S. 123, 159-60,

28 S. Ct. 441, 453-54 (1908); see Edwards, 49 F.3d at 1524.  Further, "the

Eleventh Amendment does not prohibit a plaintiff from suing state officials in

their official capacities for prospective injunctive relief."  Stevens, 864 F.2d at

115.  Thus, Warden Sikes in his official capacity is a suable defendant in Miller's

§ 1983 claims for injunctive relief.

---

[9]In Edwards, we explained that "[a] state, a state agency, and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable; but a state official sued in his official capacity is a person for purposes of § 1983 when prospective relief, including injunctive relief, is sought."  49 F.3d at 1524 (citing Will, 491 U.S. at 71, n.10, 109 S. Ct. at 2312, n.10).

In addition, a prisoner may sue state officials in their individual capacities under § 1983 and recover monetary damages, but only if such persons are not entitled to qualified immunity. See D'Aguanno v. Gallagher, 50 F.3d 877, 879 (11th Cir. 1995). Thus, Warden Sikes in his individual capacity is a suable defendant in Miller's § 1983 claims for monetary damages.

The more difficult question is whether Miller's evidence was sufficient to create factual issues regarding his alleged Eighth-Amendment violations against Warden Sikes. We discuss our Eighth-Amendment jurisprudence and then apply it to Miller's claims.

2.     Unnecessary and Wanton Infliction of Pain

"Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones." Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003) (citing Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994)). The treatment a prisoner receives in prison, along with the conditions under which the prisoner is confined, is governed by the Eighth Amendment, which prohibits cruel and unusual punishment. Id. (citing Helling v. McKinney, 509 U.S. 25, 31, 113 S. Ct. 2475, 2480 (1993)).

The Eighth Amendment, however, "does not authorize judicial reconsideration of 'every governmental action affecting the interests or well-being

18

of a prisoner.'" Campbell v. Sikes, 169 F.3d 1353, 1362 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 319, 109 S. Ct. 1078, 1084 (1988)). "If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.'" Chandler v. Crosby (11th Cir. August 6, 2004) (Slip Op. at 3368) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981)). Prison conditions rise to the level of an Eighth-Amendment violation only when they involve the wanton and unnecessary infliction of pain. Id.; Hope v. Pelzer, 536 U.S. 730, 737, 122 S. Ct. 2508, 2514 (2002); Farrow, 320 F.3d at 1242; Campbell, 169 F.3d at 1362. To establish "unnecessary and wanton infliction of pain," a plaintiff is required to show "that officials acted with specific intent." Campbell, 169 F.3d at 1362. "[T]he exact nature of the specific intent required depends on the type of claim at issue." Id. at 1363.

To show an Eighth-Amendment violation, a prisoner must satisfy both an objective and a subjective inquiry. Chandler, Slip Op. at 3369; Farrow, 320 F.3d at 1243. Under the objective component, a prisoner must prove the condition he complains of is sufficiently serious to violate the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999 (1992). Specifically, a prisoner must prove "a serious medical need" or the denial of "the minimal civilized

19

measure of life's necessities." Chandler, Slip Op. at 3369; Farrow, 320 F.3d at 1243; Rhodes, 452 U.S. at 347, 101 S. Ct. at 2399. "The challenged prison condition must be 'extreme'" and must pose "an unreasonable risk of serious damage to his future health." Chandler, Slip Op. at 3369 (quoting Hudson, 503 U.S. at 9, 112 S. Ct. at 1000) (other citation omitted).

Under the subjective component, the prisoner must prove that the prison official acted with "deliberate indifference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979 (stating that an individual may be held liable under the Eighth Amendment only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); Hudson, 503 U.S. at 8, 112 S. Ct. at 999; Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 2327 (1991). To prove deliberate indifference, the prisoner must show that the defendant prison official "'acted with a sufficiently culpable state of mind'" with regard to the serious prison condition or serious medical need in issue. Chandler, Slip Op. at 3369 (quoting Hudson, 503 U.S. at 8, 112 S. Ct. at 999). Negligence or even gross negligence does not satisfy this standard. Id.; Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).

20

It is also "well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). Supervisory liability under § 1983 occurs only when "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Id. A causal connection may be established: (1) when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [or she] fails to do so"; (2) when "a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or (3) when "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id. (internal punctuation, quotation marks, and citations omitted). We now turn to Miller's claims against Warden Sikes.

## 3. Miller's Claims

We conclude that Miller's evidence creates genuine issues of material fact regarding his Eighth-Amendment claims for monetary damages against Warden

21

Sikes in his individual capacity and for injunctive relief against Warden Sikes in his official capacity.

As a wheelchair-bound paraplegic who suffers from complete paralysis in his right leg, partial paralysis in his left leg, and a bladder condition that causes urinary incontinence, Miller unquestionably has serious medical needs. See Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (immobile broken foot constituted serious medical need); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989) (deteriorating leg constituted serious medical need); see also Simmons v. Cook, 154 F.3d 805, 808 (8th Cir. 1998) (concluding that wheelchair-bound paraplegic had serious medical needs); Weeks v. Chaboudy, 984 F.2d 185, 187-88 (6th Cir. 1993) (same); LaFaut v. Smith, 834 F.2d 389, 393-94 (4th Cir. 1987) (same); Maclin v. Freake, 650 F.2d 885, 889 (7th Cir. 1981) (same).[10]  Miller has presented evidence that he was denied certain of those needs.  As discussed previously, Miller presented testimony and affidavits stating that he has been denied wheelchair repairs, physical therapy, medical consultations, and medical devices such as leg braces and orthopedic shoes, effectively rendering Miller

_____

[10]We recognize that Dr. Mailloux says that Miller is only partially paralyzed in one leg and can ambulate somewhat.  However, Miller's evidence is that he cannot, creating factual issues.  In any event, even accepting Dr. Mailloux's statements as true, Miller still has serious medical needs and is at least substantially confined to a wheelchair.

immobile and causing his muscles to atrophy. According to Miller, this problem is exacerbated by the undisputed failure of GSP officials to remove his bed daily from his cell to allow him to maneuver his wheelchair, as required by prison policy.[11] Miller's evidence further suggests that GSP's failure to provide him with required medical care has caused his spinal condition to deteriorate.

In addition, Miller has presented affidavits stating that the K-Building in which he is housed does not contain wheelchair-accessible showers and toilets, that he is denied the opportunity to bathe, and that he is denied urine catheters and staff assistance in using toilets. While the defendants hotly dispute these assertions, Miller's evidence creates genuine issues of material fact as to whether he, as a paraplegic, has been afforded the basic levels of humane care and hygiene. Assuming the truth of the affidavits presented by Miller – that Miller is wheelchair-bound and virtually immobile or trapped in his small, unsanitary cell for extended periods, forced to remain in his own urine and excrement with no ability to move and no physical therapy, as his body deteriorates – Miller has satisfied the objective prong of the deliberate indifference inquiry.

---

[11] The district court adopted the magistrate judge's report recommending denial of Miller's preliminary injunction motion for failure to show irreparable injury. In that report, however, the magistrate judge found that Miller arguably demonstrated a likelihood of success on his Eighth-Amendment claim that GSP prison officials, such as Warden Sikes, knowingly failed to have his bed removed from his cell each day, as recommended by the Legal Division of the GDOC.

Regarding the subjective inquiry, Sikes acknowledged receiving numerous verbal and written complaints from Miller and even visited his cell. Sikes noted that Miller's complaints have been "voiced countless times." According to Miller's evidence, Sikes was aware of Miller's serious medical needs, the conditions of his confinement, and that GSP staff were not correcting the alleged deprivations and thus were acting unlawfully. Yet, according to Miller's evidence, Sikes nevertheless did not exercise his authority as Warden to provide Miller with the required medical attention and basic living conditions to which he is entitled under the Eighth Amendment.[12]

As noted earlier, supervisors, such as Warden Sikes, are not vicariously liable for the inaction of prison medical staff, guards, or other prison officials. What Miller claims, however, is that Warden Sikes knew GSP staff were acting unlawfully and that Sikes failed to stop them. To some extent, Miller's evidence also implicates Warden Sikes in not personally having followed the prison policy

---

[12]See, e.g., Simmons, 154 F.3d at 808 (concluding that prison officials were deliberately indifferent to needs of paraplegic, where wheelchair could not pass through the cell doors and maneuver around the cell bunk to reach the food tray slot and the toilet had no handrails); Weeks, 984 F.2d at 187 (doctor's knowledge that paraplegic prisoner could not have wheelchair in cellblock and refusal to admit prisoner to the infirmary, where he could use a wheelchair, established deliberate indifference); LaFaut, 834 F.2d at 393-94 (deliberate indifference where paraplegic inmate was not provided convenient wheelchair-accessible toilet and was not provided adequate rehabilitation therapy during incarceration); Maclin, 650 F.2d at 889 (concluding that paraplegic inmate established colorable deliberate-indifference claim where he received no physical therapy during eleven months of incarceration).

regarding removal of Miller's bed from his cell. While we recognize that Sikes's version of events differs totally from Miller's, the evidence presented by Miller creates genuine issues of material fact as to whether Sikes was deliberately indifferent to Miller's serious medical needs and to the inhumane conditions in which Miller is housed, in violation of the Eighth Amendment. Accordingly, the district court erred in granting summary judgment to defendant Sikes on Miller's Eighth-Amendment claims under § 1983.[13]

## B.    ADA Injunctive Relief

We also agree with Miller that he is entitled to sue defendant Sikes in his official capacity for injunctive relief under the ADA, and that the Eleventh Amendment does not bar such suits.[14]

---

[13]Because the district court found no constitutional violation under the Eighth Amendment, the district court did not address whether defendant Sikes individually is entitled to qualified immunity on any of Miller's § 1983 claims for monetary damages. See Farrow, 320 F.3d at 1249 n.22. On appeal, the defendants also have not addressed qualified immunity. We believe that this issue is best addressed by the district court in the first instance.

In addition, we note that Miller brought another § 1983 lawsuit for Eighth-Amendment violations in Miller v. Wetherington, case no. 99-00083-CV-JEG-6 (S.D. Ga.), aff'd, No. 02-15471 (11th Cir. Oct. 31, 2003). On appeal, the defendants do not contend that any of Miller's Eighth-Amendment claims in this case was already decided in his other case. Thus, Miller may proceed on his Eighth-Amendment claims in this § 1983 suit.

[14]In addition, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury." Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) (quoting Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001)). In ADA cases, this Court has held that a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future disability

Title II of the ADA generally prohibits disability discrimination by a "public entity" in the administration of its services, programs, or activities. 42 U.S.C. § 12132. The ADA extends to disability discrimination against state prison inmates. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 212, 213, 118 S. Ct. 1952, 1956 (1998) (stating that the "ADA unambiguously extends to state prison inmates," but declining to determine whether that application is a constitutional exercise of congressional power); see also Onishea v. Hopper, 171 F.3d 1289, 1296 n.11 (11th Cir. 1999) (en banc) (stating "The Supreme Court . . . decided that the Americans with Disabilities Act applies to prisons") (citing Yeskey, 524 U.S. 206, 118 S. Ct. 1952). Thus, the principal remaining issue raised here as to Miller's ADA claim for injunctive relief is whether it is barred by the Eleventh Amendment.

While the Eleventh Amendment generally bars suits against non-consenting States, "[u]nder the doctrine of Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), there is a long and well-recognized exception to this rule for suits against state officers seeking prospective equitable relief to end continuing violations of federal law." Fla. Ass'n. of Rehab. Facilities v. Fla. Dept. of Health

---

discrimination by the defendant. Id. Miller is serving a life sentence for murder. Given that Miller will remain incarcerated for some time, he has met this standing requirement for injunctive relief.

26

and Rehab. Servs., 225 F.3d 1208, 1219 (11th Cir. 2000) (addressing a suit under

the Medicaid Act).

This Ex parte Young exception was recognized in the ADA context in

Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 374 n.9, 121

S. Ct. 955, 968 n.9 (2001). The Supreme Court in Garrett first concluded that

States are entitled to sovereign immunity under the Eleventh Amendment for suits

for monetary damages under Title I of the ADA. In a footnote, however, the

Supreme Court reaffirmed the Ex parte Young exception, noting that its holding

about monetary damages did not preclude suits under Title I of the ADA against

state officials in their official capacities for injunctive relief, as follows:

> Our holding here that Congress did not validly abrogate the States'
> sovereign immunity from suit by private individuals for money damages
> under Title I does not mean that persons with disabilities have no federal
> recourse against discrimination. Title I of the ADA still prescribes
> standards applicable to the States. Those standards can be enforced by
> the United States in actions for money damages, as well as by private
> individuals in actions for injunctive relief under Ex parte Young, 209
> U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). . . .

Id., n.9 (emphasis added). Although the above footnote was in the context of Title

I rather than Title II of the ADA, and although the Supreme Court in Garrett

emphasized it was ruling only on Title I,[15] we see no reason (and the State

_____

[15]In Garrett, the Supreme Court expressly declined to address whether monetary damages
under Title II of the ADA are recoverable from the States. 531 U.S. at 360, n.1, 121 S. Ct. at

27

defendants offer none) that claims under Title II should be treated differently with regard to injunctive relief.[16]

Therefore, we join our sister circuits in holding that the Eleventh Amendment does not bar ADA suits under Title II for prospective injunctive relief against state officials in their official capacities. McCarthy v. Hawkins, — F.3d — (2004 WL 1789945 at * 7) (5th Cir. August 11, 2004); Chaffin v. Kansas State Fair Bd., 348 F.3d 850, 866-67 (10th Cir. 2003); Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003) ("This footnote, albeit dicta and although specifically addressing Title I, reflects that the Ex parte Young exception to the Eleventh-Amendment bar to suit is viable under the ADA."); Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906, 913 (7th Cir. 2003) (noting that there is "no relevant difference between Title I and Title II, which governs access to services, so far as the applicability of Ex parte Young is concerned"); Miranda B. v. Kitzhaber, 328 F.3d 1181, 1187 (9th Cir. 2003); Carten v. Kent State Univ., 282 F.3d 391, 396

960, n.1 ("We are not disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question.").

[16]As discussed in greater detail later in this opinion, ADA Title II's terms do not authorize a suit against an individual; rather, they subject only a "public entity" to liability. 42 U.S.C. § 12132. However, in an official-capacity suit for injunctive relief, the real party in interest is the government entity. Thus, a suit against a state official in his or her official capacity is in effect against a "public entity" and is authorized by § 12132. See Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003).

28

(6th Cir. 2002) (holding that "an official who violates Title II of the ADA does not represent 'the state' for purposes of the Eleventh Amendment, yet he or she nevertheless may be held responsible in an official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'"); Randolph v. Rogers, 253 F.3d 342, 348 (8th Cir. 2001).

We now turn to what Miller must prove to obtain injunctive relief in his ADA claims. To prove a claim under Title II of the ADA, a plaintiff must establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from the participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such entity; (3) by reason of such disability. Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (citing 42 U.S.C. § 12132).[17] While the public entity in Shotz was a county courthouse, this standard is equally applicable when the public entity or agency is a state prison. See Thompson v. Davis, 295 F.3d 890, 895 (9th Cir. 2002); Randolph, 170 F.3d at 858; Love v. Westville Corr. Ctr., 103 F.3d 558, 560 (7th Cir. 1996).[18]

---

[17]A "public entity" is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

[18]Thompson, Randolph, and Love are cases involving prisoner suits under Title II of the ADA. In each case, our sister circuits applied the same test as this Court applied in Shotz.

29

In order to establish the first element of a claim under Title II of the ADA, the plaintiff must show that he is disabled and "that he 'meets the essential eligibility requirements' for participating in the program, with or without reasonable accommodations." Love, 103 F.3d at 560 (quoting 42 U.S.C. § 12131(2)).[19] The ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). In turn, "major life activities" are defined as including "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Chenoweth v. Hillsborough County, 250 F.3d 1328, 1329 (11th Cir. 2001) (quoting ADA regulations in 29 C.F.R. § 1630.2(i)).[20]

---

[19]Section 12131(2) states, as follows:
The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
42 U.S.C. § 12131(2).

[20]According to the EEOC regulations interpreting the ADA,
The term substantially limits means:
(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an

30

In this case Miller, a paraplegic, is disabled under the ADA because he is substantially limited in the major life activity of walking. See 29 C.F.R. Pt. 1630, App. § 1630.2(j) (2004) ("[A]n individual whose legs are paralyzed" or who "can only walk for very brief periods of time" is substantially limited in the activity of walking).

In the prison context, the difficult question is what constitutes a "qualified individual" under the ADA. A disabled prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other, valid penal justifications. See Love, 103 F.3d at 561 ("Nowhere does Westville [prison] argue that some other reason motivated its actions, such as the need to confine Love for disciplinary reasons, or for fear that other inmates would be infected, or because Love was otherwise unqualified to participate."); see also Onishea, 171 F.3d at 1296-1301. Thus, whether a particular disabled prisoner is "qualified" to participate in the service, program or activity at issue must be decided case by case based on numerous

_____

individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
29 C.F.R. § 1630.2(j)(1).

31

factors, including but not limited to valid penal justifications for excluding a particular individual prisoner from a service, program, or activity.

If a prisoner is both disabled and an "otherwise qualified individual," a state prison may not deny services, programs, or activities merely because the prisoner has a disability. In Shotz, this Court noted that ADA regulations required that "'no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.'" Shotz, 256 F.3d at 1079-80 (quoting 28 C.F.R. § 35.149). Rather, "a public entity must make its services, programs, or activities readily accessible to disabled individuals." Id. (internal quotations and citations omitted); see Randolph, 170 F.3d at 858 (The ADA "require[s] that otherwise qualified individuals receive meaningful access to programs and activities." (quotation marks and citations omitted)); 28 C.F.R. § 35.150(a) (2004) ("A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.").

Nonetheless, even if an inmate is a "qualified" individual and entitled to reasonable accommodations, we must emphasize that "terms like 'reasonable' . . .

32

are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory . . . ." Crawford v. Indiana Dep't of Corrs., 115 F.3d 481, 487 (7th Cir. 1997), abrogated on other grounds, Erickson v. Bd. of Governors of State Colls. & Univs. for Northeastern Ill. Univ., 207 F.3d 945 (7th Cir. 2000). Consequently, courts must be mindful of the necessary balance between the ADA's worthy goal of integration and a prison's unique need for security, safety, and other penological concerns. See Randolph, 170 F.3d at 859 ("The defendants presented substantial evidence that Randolph's request for [a signing] interpreter created safety and security issues, as well as placed a financial burden on the prison. The Department of Corrections is entitled to have its evidence considered by the fact-finder in this case."); Love, 103 F.3d at 561 ("Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account."); Crawford, 115 F.3d at 487 ("The security concerns that the defendant rightly emphasizes in urging us to exclude prisoners from the protections of the Act are highly relevant to determining the feasibility of the accommodations that disabled prisoners need in order to have access to desired programs and services.").

Finally, prisoner access to programs need not be universal because "[a] public entity need not 'make structural changes in existing facilities where other

33

methods are effective in achieving compliance with this section.'" Shotz, 256 F.3d

at 1080 (quoting 28 C.F.R. § 35.150(b)(1)).  Rather, "if one facility is inaccessible,

a [prison] may comply with Title II by making its services, programs, and

activities available at another facility that is accessible."  Shotz, 256 F.3d at 1080

(citing Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000)).[21]

While we conclude that Miller has a disability under the ADA, the

magistrate judge did not address Miller's ADA claims for injunctive relief and

whether Miller was a "qualified individual" under the ADA, or whether his

disciplinary problems made him unqualified to participate in certain services,

programs, or activities.  If Miller is a qualified individual for at least some

services, programs, or activities, the magistrate judge also did not address what

accommodations are reasonable under the ADA in Miller's particular case.  Thus,

we remand all of Miller's ADA claims for injunctive relief against defendant Sikes

---

[21]Nothing in this opinion should be read as creating a "right of transfer" to a particular prison under the ADA.  Rather, prison authorities still maintain a great deal of discretion in running their penal institutions, and such discretion normally outweighs any interest that any individual prisoner may have in remaining housed in a particular prison.  See Olim v. Wakinekona, 461 U.S. 238, 245, 103 S. Ct. 1741, 1745 (1983) (prisoners have no right to be incarcerated in any particular prison within a state); Ellard v. Alabama Bd. of Pardons and Paroles, 824 F.2d 937, 941-42 (11th Cir. 1987).  However, in the context of the ADA, a prisoner's transfer from or to a particular prison may become relevant when prison officials attempt to determine what constitutes a "reasonable" accommodation.

34

in his official capacity for the district court to determine these issues in the first instance.

**C.    ADA Monetary Damages Claims**

On appeal, Miller also argues that the magistrate judge erred in granting summary judgment for defendants on Miller's ADA claims for monetary damages. As explained above, the ADA applies to state prisons, and Miller is entitled to prove his ADA claims for injunctive relief against defendant Warden Sikes in his official capacity.  Regarding Miller's ADA claims for monetary damages, however, this case presents the formidable legal question of whether Congress constitutionally abrogated the Eleventh Amendment in Title II of the ADA – a question that has attracted significant and well-founded debate in the courts.  To aid our analysis, we describe the interplay between the ADA and the Eleventh Amendment, and the evolving jurisprudence in this area, culminating in the Supreme Court's recent decision in <u>Tennessee v. Lane</u>, 124 S. Ct. 1978 (2004).

<u>1.    ADA Overview</u>

The purpose of the ADA is  "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §§ 12101(b)(1).  To that end, the ADA invokes "the sweep of congressional authority, including the power to enforce the fourteenth

amendment and to regulate commerce," 42 U.S.C. §§ 12101(b)(4), and generally prohibits discrimination against individuals with disabilities in the areas of employment (Title I); public services, programs, and activities (Title II); and public accommodations (Title III). See Lane, 124 S. Ct. at 1984.

Specifically, Title II of the ADA – the title at issue here – prescribes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). Title II thus purports to regulate discrimination in the provision of public services, programs, or activities by public entities. The Supreme Court has instructed that the ADA extends to discrimination against state prison inmates. Yeskey, 524 U.S. at 211-12, 118 S. Ct. at 1955-56. Neither the Supreme Court nor this Court, however, has yet addressed the precise issue in this case: whether States can be sued for monetary damages for violations of Title II of the ADA, as applied in the prison context.

2. Eleventh-Amendment Analysis

As a general rule, the Eleventh Amendment grants States immunity to suits brought by private citizens in federal court.[22]  The Supreme Court has recognized that Congress can abrogate that sovereign immunity where (1) Congress "unequivocally expressed its intent to abrogate" the States' sovereign immunity in the statute at issue, and (2) "Congress acted pursuant to a valid grant of constitutional authority."  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73, 120 S. Ct. 631, 640 (2000).  The ADA plainly states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State Court . . . for a violation of" the ADA.  42 U.S.C. § 12202.  Accordingly, the first requirement – a clear intention to abrogate Eleventh-Amendment immunity – is satisfied.  See Lane, 124 S. Ct. at 1985.  As to the second requirement, the ADA invokes "the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce . . . ." 42 U.S.C. §§ 12101(b)(4).  However, the Supreme Court has clarified that Congress may not abrogate the States' Eleventh-Amendment immunity for monetary-damages suits based on its Article I commerce power.

---

[22]The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.

Garrett, 531 U.S. at 364, 121 S. Ct. at 962; Kimel, 528 U.S. at 79, 120 S. Ct. at 643. The paramount question, then, is whether Congress's intended abrogation of the States' Eleventh-Amendment immunity in Title II of the ADA was a valid exercise of its remedial powers under § 5 of the Fourteenth Amendment.[23]

Section 5 of the Fourteenth Amendment provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. The Supreme Court has concluded that § 5 authorizes Congress to "remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Kimel, 528 U.S. at 81, 120 S. Ct. 644. "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" City of Boerne v. Flores, 521 U.S. 507, 518, 117 S. Ct. 2157, 2163 (1997) (citation omitted).

---

[23]In the district court, the defendants' supplemental brief in support of their summary judgment motion argued that the Commerce Clause also does not authorize Congress to regulate state prisons through Title II of the ADA. The district court's order did not address this issue. Although we address in this section whether Title II is valid § 5 legislation, we do not address whether Title II was validly enacted under Congress's Article I commerce power for purposes of injunctive relief against States. Because the parties have not briefed this Commerce-Clause-injunctive-relief issue on appeal, we leave it to the district court to address the issue in the first instance if it is raised by the parties on remand.

On the other hand, the Supreme Court has decided that the remedial and preventive measures "may not work a 'substantive change in the governing law.'" Lane, 124 S. Ct. at 1986 (quoting Boerne, 521 U.S. at 519, 117 S. Ct. at 2164). Regarding Congress's § 5 authority, the Supreme Court has acknowledged that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies," but has stressed that "the distinction exists and must be observed." Boerne, 521 U.S. at 519-20, 117 S. Ct. at 2164.

In determining whether Congress has acted within the scope of its § 5 power to abrogate States' sovereign immunity, the Supreme Court applies the three-part "congruence and proportionality" test first established in Boerne. 521 U.S. at 520, 117 S. Ct. at 2164. In applying the Boerne test, a court must: (1) identify "with some precision the scope of the constitutional right at issue," Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 365, 121 S. Ct. 955, 963 (2001); (2) determine whether Congress identified a history and pattern of unconstitutional conduct by the States, and (3) if so, analyze whether the statute is an appropriate, congruent and proportional response to that history and pattern of unconstitutional treatment.

Garrett, 531 U.S. at 374, 121 S. Ct. at 968; see Boerne, 521 U.S. at 520, 117 S. Ct. at 2164.

In Garrett, 531 U.S. at 374, 121 S. Ct. at 968, the Supreme Court applied the Boerne test to Title I of the ADA and held that Congress did not validly abrogate the States' Eleventh-Amendment immunity to suits for monetary damages under Title I, which relates to employment discrimination. The Supreme Court's decision in Garrett was driven by its conclusion that Congress's exercise of prophylactic powers under § 5 was unsupported by a relevant history and pattern of constitutional violations. 531 U.S. at 368, 374, 121 S. Ct. at 965, 967-68. In so holding, the majority opinion in Garrett stated that the "overwhelming majority" of the evidence before Congress relating to disability discrimination related to "the provision of public services and public accommodations, which areas are addressed in Titles II and III," rather than Title I. Id. at 371, n.7, 121 S. Ct. at 966 n.7. Thus, in Garrett, the Supreme Court left unanswered the question raised here of whether Congress validly abrogated the Eleventh Amendment in Title II of the ADA.[24]

In Tennessee v. Lane, the Supreme Court revisited the question of whether Congress validly abrogated the Eleventh Amendment in the ADA, this time

---

[24]See supra note 15.

40

examining Title II in the context of access of disabled persons to the courts.

Although the plaintiffs in Lane were not prisoners, Lane explains the analysis

required to determine whether Title II of the ADA properly abrogates the Eleventh

Amendment in the prison context in this case.  Thus, we review Lane in detail.

3.      Tennessee v. Lane

In Lane, the plaintiffs asserted ADA claims relating to the access of

disabled persons to courts.  After summarily acknowledging that Congress clearly

intended to abrogate Eleventh-Amendment immunity in Title II, the Supreme

Court reaffirmed the application of the Boerne "congruence and proportionality"

test.  Lane, 124 S. Ct. at 1986.  Applying the first step of the Boerne analysis, the

Supreme Court noted that Title II, like Title I, seeks to enforce the Fourteenth

Amendment's "prohibition on irrational disability discrimination."  Id. at 1988.

But, the Supreme Court concluded, "it also seeks to enforce a variety of other

basic constitutional guarantees, infringements of which are subject to more

searching judicial review," including rights relating to access to courts protected

by the Due-Process Clause of the Fourteenth Amendment and the Confrontation

Clause of the Sixth Amendment (applied to the States via the Fourteenth

Amendment).  Id.

In <u>Lane</u>, the Supreme Court then proceeded to the second step, in which it addressed the history and pattern of violations of these constitutional rights by States against the disabled.  After noting that the "appropriateness of the remedy depends on the gravity of the harm it seeks to prevent," the Supreme Court stated: "It is not difficult to perceive the harm that Title II is designed to address. Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights."  <u>Id.</u> at 1988-89.  The Supreme Court catalogued many such deprivations in the areas of voting, marrying, serving as jurors, unjustified commitment, abuse and neglect in mental health hospitals, and zoning decisions, and then explained that the decisions of other courts "document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including <u>the penal system</u>, public education, and voting."  <u>Id.</u> at 1989 (footnotes omitted) (emphasis added).  In <u>Lane</u>, the Supreme Court concluded that "[t]his pattern of disability discrimination persisted despite several federal and state legislative efforts to address it," and that in the deliberations preceding the ADA's enactment, "Congress identified important shortcomings in existing laws that rendered them 'inadequate to address the

pervasive problems of discrimination that people with disabilities are facing.'" Id.

at 1990 (quoting S. Rep. No. 101-116, at 18).

The Supreme Court completed its step-two analysis with the conclusion that

Title II was enacted in response to a history and pattern of disability

discrimination in the "provision of public services and access to public facilities,"

as follows:

> The conclusion that Congress drew from this body of evidence is set forth in the text of the ADA itself: "Discrimination against individuals with disabilities persists in such critical areas as . . . education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3) (emphasis added). This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation.

Id. at 1992 (emphasis added). The Supreme Court in Lane concluded that Title II

of the ADA was enacted in response to a history and pattern of constitutional

violations by the States, thereby satisfying Boerne's step-two inquiry.[25]

---

[25]In a footnote in Lane, the Supreme Court listed only one district court and two circuit court decisions regarding deprivation of rights in the penal system. The footnote stated:
> E.g., LaFaut v. Smith, 834 F.2d 389, 394 (C.A.4 1987) (paraplegic inmate unable to access toilet facilities); Schmidt v. Odell, 64 F.Supp.2d 1014 (D.Kan. 1999) (double amputee forced to crawl around the floor of jail). See also, e.g., Key v. Grayson, 179 F.3d 996 (C.A.6 1999) (deaf inmate denied access to sex offender therapy program allegedly required as precondition for parole).

Lane, 124 S. Ct. at 1989 n.11. We note that two of these decisions were rendered after the ADA was enacted but were used by the Supreme Court as evidence of past discrimination addressed by the ADA. While it seems to us that there was little documentation of a history and pattern of disability

43

The third and final query in the Eleventh-Amendment analysis is whether the legislation at issue is a congruent, proportional response to that history. In Lane, the Supreme Court declined to decide whether Title II as a whole satisfies Boerne's step-three congruence-and-proportionality requirement. Instead, the Supreme Court adopted an "as-applied" test, stating that "nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole. . . . Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further." Id. at 1992-93 (emphasis added).[26]

Noting the long history and intractability of the States' disability discrimination in the area of access to courts, and more generally the unequal treatment in the administration of public services, and the "considerable evidence of the shortcomings of previous legislative responses," the Supreme Court concluded that Congress was justified in enacting prophylactic measures in Title II

discrimination in prisons recited in Lane, see note 30 infra, the Supreme Court in Lane in effect has decided the step-two inquiry as to Title II, and we must follow the Supreme Court's lead.

[26]This "as-applied" approach was heavily criticized in the dissent of Justice Rehnquist, in which Justices Kennedy and Thomas joined. Lane, 124 S. Ct. at 2004-05 (Rehnquist, J., dissenting) ("The effect [of the as-applied analytical approach] is to rig the congruence-and-proportionality test by artificially constricting the scope of the statute to closely mirror a recognized constitutional right."). Because the majority opinion, however, follows an as-applied approach, we also must do so in this case.

for access to judicial services.  Id. at 1993.  The Supreme Court characterized Title II's remedy in the area of access to courts as "limited" in that it does not require "States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs."  Id.  Rather, Title II requires only "reasonable modifications."  Id.

Moreover, in Lane the Supreme Court emphasized the traditional breadth of the States' due-process responsibility to afford individuals access to courts.  In light of the limited nature of the ADA's remedy and the States' expansive due-process responsibilities, the Court concluded: "This duty to accommodate is perfectly consistent with the well-established due process principle that, 'within the limits of practicability, a State must afford all individuals a meaningful opportunity to be heard' in its courts."  Id. at 1994 (quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S. Ct. 780, 786-87 (1971)) (emphasis added).  The Supreme Court thus concluded that Title II's obligation to accommodate persons with disabilities in the administration of justice "cannot be said to be 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'"  Id.

45

We now apply the Boerne/Lane test to Miller's ADA claims in the prison setting.[27]

4.    Application of Boerne/Lane to this case

In the first step of the Boerne/Lane analysis, we identify the scope of the constitutional right at issue.  Both Miller and the defendants agree that the only right at issue in this particular case is Miller's Eighth-Amendment right to be free from cruel and unusual punishment.[28]

The second step requires us to determine whether Title II was enacted in response to a history and pattern of constitutional violations by the States.  Although the defendants argue there is insufficient evidence of disability

---

[27]We can locate no post-Lane circuit court decision deciding whether Congress in Title II of the ADA validly abrogated the States' immunity for monetary damages outside the access-to-the-courts context.  Before Lane, the circuits were split on this issue.  Compare Wessel v. Glendening, 306 F.3d 203 (4th Cir. 2002) (no valid abrogation); Thompson v. Colorado, 278 F.3d 1020 (10th Cir. 2001) (same); Reickenbacker v. Foster, 274 F.3d 974 (5th Cir. 2001) (same); Alsbrook v. City of Maumelle, 184 F.3d 999 (8th Cir. 1999) (same) with Hason v. Medical Bd. of California, 279 F.3d 1167 (9th Cir. 2002) (abrogation valid); Popovich v. Cuyahoga County Ct. of Common Pleas, 276 F.3d 808 (6th Cir. 2002) (en banc) (Eleventh Amendment validly abrogated in context of fundamental, due-process-based claims, but not equal-protection-based claims); Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001) (abrogation valid only as to cases where Title II violation was motivated by discriminatory animus or ill will due to disability).

[28]In this case, the United States (as intervenor on appeal) argues that Miller's case implicates a panoply of prisoner rights, but the parties do not.  Accordingly, we need not consider the host of rights identified by the United States, and we limit our opinion to the Eighth-Amendment right to be free from cruel and unusual punishment.

46

discrimination in prisons, we conclude that this step-two inquiry under Title II already has been decided by the Supreme Court in Lane. As previously discussed, in applying the second step of the Boerne test, the Supreme Court in Lane considered evidence of disability discrimination in the administration of public services and programs generally, rather than focusing only on discrimination in the context of access to the courts, and concluded that Title II in its entirety satisfies Boerne's step-two requirement that it be enacted in response to a history and pattern of States' constitutional violations. Id. at 1992. We are bound by that conclusion as to step two.

We now proceed to the third and final step of the Boerne/Lane inquiry. This Court must decide if Title II of the ADA, as applied to claims rooted in the Eighth Amendment, is an appropriate § 5 response to the above-described history and pattern of unconstitutional treatment. Lane, 124 S. Ct. at 1992. Given Lane, we accepted at step two that Title II was enacted in response to a history and pattern of disability discrimination in the administration of public services and programs generally. To give meaning to the Supreme Court's context-by-context analytical approach, however, we must consider, in step three, the history of discrimination not generally but specifically in the prison context, and the scope of the Eighth-Amendment constitutional right, and determine whether the remedy

47

afforded by Title II is congruent and proportional to its historical backdrop and to the object of enforcing the Eighth-Amendment right to be free from cruel and unusual punishment. <u>Lane</u>, 124 S. Ct. at 1993. To meet this congruence-and-proportionality test, legislation must be tailored to remedy or prevent the demonstrated unconstitutional conduct. <u>Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank</u>, 527 U.S. 627, 639, 119 S. Ct. 2199, 2207 (1999).

We recognize that § 5 authorizes Congress to deter Eighth-Amendment violations by prohibiting "a somewhat broader swath of conduct" than that prohibited by the Eighth Amendment and by proscribing "facially constitutional conduct[] in order to prevent and deter unconstitutional conduct." <u>Lane</u>, 124 S. Ct. at 1985 (internal quotation marks and citations omitted). Congress's remedial and preventive measures, however, may not go so far as to work a substantive change in the governing Eighth-Amendment law. <u>Lane</u>, 124 S. Ct. at 1986 (stating that Congress's remedial and preventive measures "may not work a 'substantive change in the governing law'" (quoting <u>Boerne</u>, 521 U.S. at 519, 117 S. Ct. at 2164)). In other words, § 5 does not place in the hands of Congress a tool to rewrite the Bill of Rights. Instead, when Congress enacts § 5 prophylactic legislation, there must be "proportionality or congruence between the means

adopted and the legitimate end to be achieved." Boerne, 521 U.S. at 533, 117 S.

Ct. at 2171.

Miller and the United States, as intervenor, argue that a history and pattern

of disability discrimination in prisons existed and also formed part of the historical

backdrop against which Congress enacted Title II of the ADA.[29] While the

defendants contend that the evidence of a history and pattern of unequal treatment

in prisons is scant, Miller argues that the evidence as to prisons is not substantially

less meaningful than the evidence upon which the Supreme Court relied in Lane in

the context of access to courts.[30] Even if a documented history of disability

[29]Specifically, they point to: evidence before Congress that "jailers rational[ized] taking away [disabled inmates'] wheelchairs as a form of punishment," Staff of the House Comm. On Educ. And Labor, 101st Cong., 2d Sess., Legislative History of Pub. L. No. 101-336: The Americans with Disabilities Act, Volume 2, at p. 1190 (Comm. Print 1990); and evidence presented to the House and Senate Subcommittees that called attention to the "[i]nadequate treatment and rehabilitation programs [afforded the disabled] in penal and juvenile facilities," and the "[i]nadequate ability to deal with physically handicapped accused persons and convicts (e.g., accessible jail cells and toilet facilities)," U.S. Comm'n on Civil Rights, Accommodating the Spectrum of Individual Abilities, Sept. 1983, App. A at 168. The United States also notes that a congressionally-designated task force submitted to Congress several thousand documents evidencing discrimination and segregation in the provision of public services, including the treatment of persons with disabilities in prisons and jails, see Garrett, 531 U.S. at 393, 121 S. Ct. at 978 (Appendix to Justice Breyer's dissent), and cites anecdotal evidence of discrimination from a report of the California Attorney General, see Calif. Att'y Gen., Commission on Disability: Final Report 103 (Dec. 1989). Miller and the United States also cite several court decisions, including those noted in Lane, relating to discrimination against prisoners. See supra note 25.

[30]In Lane, the Supreme Court devoted a single paragraph to the history of disability discrimination in the specific area at issue in Lane – access to courts. Lane, 124 S. Ct. at 1991. But see id. at 2000 (Rehnquist, J., dissenting) ("The Court's attempt to disguise the lack of congressional documentation with a few citations to judicial decisions cannot retroactively

discrimination specifically in the prison context justifies application of some congressional prophylactic legislation to state prisons, what makes this case radically different from <u>Lane</u> is the limited nature of the constitutional right at issue and how Title II, as applied to prisons, would substantively and materially rewrite the Eighth Amendment.  In this case, we focus on the limited nature of the Eighth-Amendment right because in <u>Lane</u>, the Supreme Court's conclusion that Title II's remedy is congruent and proportional in the access-to-courts context relied heavily upon the nature of the constitutional right in issue and the States' expansive due-process obligation to provide individuals with access to the courts.  It was on that basis that the Supreme Court concluded that the Title II-imposed duty to accommodate is "perfectly consistent with the well-established due process principle that, within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard in its courts." <u>Lane</u>, 124 S. Ct. at 1994 (internal quotation marks and citation omitted).

This robust, positive due-process obligation of the States to provide meaningful and expansive court access is in stark contrast with the States' Eighth-Amendment, negative obligation to abstain from "cruel and unusual punishment,"

---

provide support for Title II, and in any event, fails on its own terms.").

a markedly narrow restriction on prison administrative conduct. In the prison context, the States historically have wielded far-reaching discretion in their treatment of inmates, confined only by the limited Eighth-Amendment requirement that such treatment not be "cruel and unusual punishment."[31] The Eighth Amendment has no effect on most prison services, programs, and activities, such as educational, recreational, and job-training programs. Rather, the Eighth Amendment is limited to punishment, and "cruel and unusual" punishment at that. In other words, the Eighth Amendment imposes a narrow restriction – "cruel and unusual" – on only a limited sphere of prison administrative conduct – "punishment." As explained above, even as to that punishment sphere, negligence or gross negligence does not satisfy the Eighth-Amendment standard. Cottrell, 85 F.3d at 1490. Instead, a prisoner alleging an Eighth-Amendment violation confronts an exacting burden of showing that the prison official wantonly and willfully inflicted pain on the inmate. Chandler, Slip Op. at 3368-69. The Eighth Amendment regulates only a small slice of prison administrative conduct.

---

[31]Indeed, "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." Lewis v. Casey, 518 U.S. 343, 386, 116 S. Ct. 2174, 2197 (1996) (quoting Preiser v. Rodriguez, 411 U.S. 475, 491-92, 93 S. Ct. 1827, 1837 (1973)).

Title II of the ADA, on the other hand, purports to proscribe the exclusion of a "qualified," disabled prisoner from participation in any "services, programs, or activities" of a public entity. Title II is not tailored to provide prophylactic protection of the Eighth-Amendment right; instead, it applies to any service, program, or activity provided by the prison, whether educational, recreational, job-training, work in prison industries, drug and alcohol counseling, or a myriad of other prison services, programs, and activities not affected by the Eighth Amendment. Although we recognize Congress's power to proscribe facially constitutional conduct, Title II does not merely proscribe a "somewhat broader swath of conduct" than the Eighth Amendment, but prohibits a different swath of conduct that is far broader and even totally unrelated to the Eighth Amendment in many instances. In short, Title II prohibits far more state conduct and in many more areas of prison administration than conceivably necessary to enforce the Eighth Amendment's ban on cruel and unusual punishment. Indeed, Title II addresses all prison services, programs, and activities – and goes well beyond the basic, humane necessities guaranteed by the Eighth Amendment – to disabled prisoners.

Accordingly, we conclude that Title II's affirmative duty to accommodate qualified, disabled prisoners is markedly different than, and cannot be said to be

"perfectly consistent with," traditional protections afforded by the Eighth Amendment. A requirement of reasonable accommodations for a qualified, disabled prisoner in the prison's educational, recreational, and job-training programs, for example, bears no permissible prophylactic relationship to deterring or remedying violations of disabled prisoners' right to be free from cruel and unusual punishment. Rather, Title II of the ADA, as applied in the Eighth-Amendment context to state prisons, fails to meet the requirement of proportionality and congruence.[32]

Miller stresses that Title II is limited in that it does not require state prisons to compromise their essential eligibility criteria for their services, programs, and activities, and that it does not require States to fundamentally alter the nature of those services, programs, or activities.[33] What Miller ignores, however, is that the

_____

[32]This case shares more in common with Title I addressed in Garrett, the Patent Remedy Act in Florida Prepaid, the Age Discrimination in Employment Act in Kimel, and the Religious Freedom Restoration Act in Boerne, all of which the Supreme Court invalidated as attempts to substantively redefine the Fourteenth Amendment. In Lane, the Supreme Court reached a different conclusion only because it decided that the ADA duty to accommodate was "perfectly consistent with" the due-process principle in issue in the access-to-the-courts context.

[33]As previously noted, the ADA's application is "limited" somewhat in that it requires only "reasonable modifications in policies, practices, and procedures," where doing so does not "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (2004). However, Title II creates in state prisoners new federal rights to participate in a broad array of services, programs, and activities that prisons are not required to provide and that are remote from the realm of the Eighth Amendment, and places upon the state prisons the onus of justifying any exclusion of a qualified, disabled prisoner from its services, programs, or activities. Thus, while Title II does not fundamentally alter the nature of a particular prison

53

Eighth Amendment has no effect on most prison services, programs, and activities.

Further, while Miller's eligibility and the extent of the state prison's ADA obligations under Title II may be much more limited due to his disciplinary status in isolation in a maximum-security building, the § 5 issue must be examined in the state-prison context as a whole and the States' ADA obligations under Title II to disabled prisoners generally, most of whom are not in disciplinary isolation in a maximum-security building.  As noted earlier, ADA regulations require that "'no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.'"  Shotz, 256 F.3d at 1079-80 (quoting 28 C.F.R. § 35.149).  While a prison's unique needs may impact what is reasonable, it is still clear that the ADA affects far more state-prison conduct and far more prison services, programs, and activities than the Eighth Amendment.  Simply put, to uphold Title II's application to state prisons would allow Congress to "rewrite" the Eighth-Amendment law.  See Garrett, 531 U.S. at 374, 121 S. Ct. at 968.  Therefore, Title II of the ADA, as applied in this

---

service, program, or activity, it does fundamentally expand and alter the nature of the States' obligations to qualified, disabled prisoners and substantively rewrites the Eighth-Amendment law.

prison case, does not validly abrogate the States' sovereign immunity and cannot

be enforced against the State of Georgia or the GDOC in a suit for monetary

damages.[34]

---

[34]If Title II as a whole fails the congruence-and-proportionality test in the Eighth-Amendment context (as we conclude here), Miller alternatively invites us to adopt an as-applied approach under which Title II of the ADA is narrowly enforced against States only where the alleged ADA violations also actually violate the constitutional right at issue – in this case, the Eighth-Amendment right to be free from cruel and unusual punishment. If Title II applies only to actual constitutional violations, the argument becomes that it is not "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Boerne, 521 U.S. at 532, 117 S. Ct. 2170. This approach was embraced pre-Lane by the Second Circuit in the equal-protection context. Garcia, 280 F.3d at 111-12 (Eleventh Amendment validly abrogated with respect to Title II claims based on actual violations of the Fourteenth Amendment).

In Kiman v. New Hampshire Department of Corrections, 301 F.3d 13 (1st Cir. 2002), the First Circuit adopted this as-applied approach in the Eighth-Amendment context, allowing a former state prisoner to proceed with his monetary-damages claims against state entities under Title II of the ADA because the plaintiff had alleged violations of the Eighth Amendment. The First Circuit concluded, "we hold that Kiman may proceed with his suit against the Department, because Title II of the ADA as applied to the facts of this case properly enforces the Eighth Amendment (as incorporated against the states by the Fourteenth) and abrogates New Hampshire's immunity from private suit." 301 F.3d at 25. However, that decision was vacated and the case reheard by the First Circuit en banc, and the en banc court affirmed the district court's dismissal of the plaintiff's ADA complaints. Kiman v. New Hampshire Dep't of Corrs., 332 F.3d 29 (1st Cir. 2003) (en banc). On petition for certiorari, the Supreme Court vacated the First Circuit's en banc judgment and remanded the case to the First Circuit for further consideration in light of Lane. Kiman v. New Hampshire Dep't of Corrs., 124 S. Ct. 2387 (2004).

In the post-Lane world, we decline Miller's invitation to follow his suggested as-applied analysis because it is inconsistent with Lane. In Lane, the Supreme Court adopted a different as-applied approach in which the constitutionality of Title II is considered context by context without any mention of the ADA violations being circumscribed by or limited to what would otherwise constitute an actual constitutional violation. Instead, Lane reaffirmed (1) that Congress's § 5 authority includes the authority to prohibit "a somewhat broader swath of conduct," including that which is not forbidden by the Fourteenth Amendment, and (2) that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." Lane, 124 S. Ct. at 1985 (citations omitted). Therefore, under Lane, conduct does not need to be unconstitutional to be validly proscribed by Congress. Further, Miller's approach would effectively impose a second

55

**D.     ADA Claims Against Individuals**

Finally, Miller argues that the magistrate judge erred in granting summary

judgment to defendant King on Miller's ADA claims against King in his

individual capacity.  We disagree because the magistrate judge properly concluded

that individuals are not subject to personal liability under § 12132 for violations of

Title II of the ADA.

As stated above, § 12132 states that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities <u>of a public entity</u>, or

be subjected to discrimination <u>by any such entity</u>."  42 U.S.C. § 12132 (emphasis

added).  Thus, the plain language of the statute applies only to public entities, and

not to individuals.

Miller, on the other hand, argues that the phrase "by any such entity"

modifies only the final clause of the sentence: "be subjected to discrimination."

Miller thus contends that the first part of the sentence, which provides that an

individual with a disability "shall not be excluded from participation in or denied

the benefits of the services, programs, or activities of a public entity," applies not

---

layer to the test announced in <u>Lane</u>, allowing Miller to proceed on ADA claims in the prison
context but only to the extent that the ADA claims constitute valid Eighth-Amendment claims.

only to public entities but also to individual officials, while the final "discrimination" clause applies only to actions of public entities.

Miller's argument fails for two reasons. First, under Miller's interpretation, Congress specified the parties that could be liable for discrimination, yet inexplicably failed to specify who could be liable for denial of benefits of services, programs, or activities, implicitly allowing a broader range of defendants to be liable for those violations. In the absence of any reason for such a distinction, Miller's interpretation is nonsensical.

Second, had Congress intended to create liability for individuals under Title II of the ADA, it easily could have provided for such liability. In fact, Congress did provide for such liability for retaliation claims. Specifically, § 12203 provides, in relevant part: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a) (emphasis added).[35] Congress clearly prohibited

---

[35]This Court has held that § 12203 establishes individual liability for a violation of its prohibitions, where the "act or practice" opposed is one made unlawful by Title II. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). In so holding, this Court noted that § 12203, unlike § 12132 (the statute at issue in this case), extends liability to any person. Specifically, the Court stated:

In fact, § 12203 is the only anti-discrimination provision in the ADA that uses the

57

ADA violations by <u>persons</u> in § 12203, and we must assume that its failure to do so in § 12132 was purposeful.  Accordingly, the natural meaning of § 12132 is that liability extends only to public entities and not to persons in their individual capacities.

We thus conclude that § 12132 does not provide for claims against individuals in their individual capacities, and that the magistrate judge did not err in granting defendant King summary judgment on that basis.  This conclusion is in accord with those of our sister circuits that have decided the issue.  <u>See, e.g.</u>, <u>Garcia v. S.U.N.Y. Health Sciences. Ctr. of Brooklyn</u>, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."); <u>Walker v. Snyder</u>, 213 F.3d 344, 346 (7th Cir. 2000), <u>abrogated on other grounds</u>, as recognized in <u>Bruggeman ex rel. Bruggeman v. Blagojevich</u>, 324 F.3d 906, 912-13 (7th Cir. 2003); <u>Vinson v. Thomas</u>, 288 F.3d 1145, 1156 (9th Cir. 2002); <u>Alsbrook v. City of Maumelle</u>,

---

unqualified term "person" to define the regulated entity.  <u>Compare</u> . . . 42 U.S.C. § 12132 ("public entity") . . . .
<u>Id.</u> at 1168.  The <u>Shotz</u> Court then noted that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," and that "Congress knows how to use specific language to identify which particular entities it seeks to regulate."  <u>Id.</u>  The Court concluded that the term "person" includes individuals, <u>id.</u>, and, ultimately concluded that liability for violations of § 12203 extends to individuals.  <u>Id.</u> at 1183.

58

184 F.3d 999, 1005 n. 8 (8th Cir. 1999) ("[W]e agree . . . that the commissioners may not be sued in their individual capacities directly under the provisions of Title II. Title II provides disabled individuals redress for discrimination by a 'public entity.' That term, as it is defined within the statute, does not include individuals.").

## IV. CONCLUSION

For all the above reasons, we reverse the grant of summary judgment to defendant Sikes (1) individually on Miller's Eighth-Amendment claims for monetary damages under § 1983, (2) in his official capacity on Miller's Eighth-Amendment claims for injunctive relief, and (3) in his official capacity on Miller's ADA claims for injunctive relief. We otherwise affirm the grant of summary judgment in favor of all defendants on all remaining claims.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED.**