Oliver COCHRAN Appellant

v.

Steven PINCHAK, Administrator of East Jersey State Prison; Patrick Arvonio, Administrator of East Jersey State Prison; Alfiero Ortiz, Assistant Administrator of East Jersey State Prison; Terrance Moore, Assistant Administrator of East Jersey State Prison; Michael Powers; Dr. Frederick Bauer; Lt. "John" Miller; Sgt. "John" Tarza; Dr. Franklin H. Spirn; Dr. Howard M. Epstein; New Jersey Department of Corrections; Thomas D. Farrell, Supervisor of the Health Services Unit of the New Jersey Department of Corrections; Scott A. Faunce, Administrator of Bayside State Prison; Charles Leone, Assistant Administrator of Bayside State Prison; "Jane" Meritt, Classification Supervisor of Bayside State Prison; "John" Blount, Correction Officer; "John" Alende, Correction Officer; "John" Davenport, Correction Officer; "John" Snell, Correction Officer; Sergeant "John" Perganski, Correction Officer; Sergeant "John" Davis, Correction Officer; Correctional Medical Services; Dr. Hertzel Zackai; Dr. "John" Carlino; Lisa Little, Hospital Administrator for Bayside State Prison; Marge Amodel Appellees

United States of America Intervenor.

No. 02–1047.

United States Court of Appeals, Third Circuit.

Argued Oct. 25, 2004.

Filed March 15, 2005.

John V. Donnelly, III (Argued), Pepper Hamilton, Philadelphia, PA, for Appellants.

Sarah E. Harrington (Argued), United States Department of Justice, Appellate Section, Washington, DC, for Intervenor United States of America.

David M. Ragonese (Argued), Office of Attorney General of New Jersey, Trenton, NJ, for Appellees.

Before SCIRICA, Chief Judge, FISHER and ALDISERT, Circuit Judges.

ALDISERT, Circuit Judge.

This appeal by Oliver Cochran, a legally blind inmate in New Jersey's South Woods State Prison ("South Woods"), requires us to decide whether the operation of the Eleventh Amendment precludes a claim for damages against New Jersey under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134 (2000). The gravamen of Cochran's complaint is that while an inmate at two penal institutions of the State, the New Jersey Department of Corrections temporarily denied him access to talking books, a talking watch, a useable lock and his walking cane.

Cochran appeals from summary judgment in favor of the New Jersey Department of Corrections and various state officials (collectively "DOC"). The United States District Court for the District of New Jersey held that Congress did not validly act within its constitutional authority in abrogating the State's immunity for claims brought by individuals against them under Title II of the ADA. (D.C. Op. at

5.)[1]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. It also provides that "[a] State shall not be immune under the eleventh amendment [sic] to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." § 12202. In *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 1994. The Court was very specific in limiting its holding to cases implicating the fundamental right of access to the courts, indicating that an individual analysis would have to be performed for subsequent Title II cases involving a different scenario. We are persuaded that a different scenario is present here.

In considering Cochran's appeal from the district court's order granting summary judgment in favor of the DOC we must follow the analytical format set out by the Court in *City of Boerne v. Flores*, 521 U.S. 507, 529, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), to determine when Eleventh Amendment Immunity will permit suits for money damages against state agencies. Because our application of this test must take full account of the policy of judicial restraint in prisoners' rights cases as set forth in *Turner v. Safley*, 482 U.S.

78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), we decide that the holding of *Tennessee v. Lane* is not applicable to these facts. We will affirm the judgment of the district court.

## I.

Appellant, Oliver Cochran, is a legally blind inmate currently incarcerated in South Woods in Bridgeton, New Jersey. Cochran is serving a life sentence for murder and robbery. In 1988, Cochran was transferred from the Florida prison system to the custody of the New Jersey DOC. When he arrived in New Jersey, he was suffering from end stage glaucoma and was legally blind.

From 1988 to 1996, Cochran was incarcerated at East Jersey State Prison ("EJSP"). In September 1996, he was transferred to Bayside State Prison ("Bayside"). In early 1998, Cochran was transferred from Bayside to South Woods, where he is currently incarcerated.

Cochran alleges that, from 1992 to 1996, while incarcerated at EJSP, the DOC discriminated against him by taking away the talking books and special tape player he requires in order to access literature. While in the Administrative Close Security Unit ("ACSU") at EJSP for approximately two months, Cochran was not permitted to have these privileges. The ACSU is the area of the prison in which security is of utmost importance; placement in the ACSU is intended to be punitive. He alleges that his talking books were not returned to him until two years after his release from the ACSU.

He further alleges that when the DOC transferred him to Bayside, it confiscated his walking cane, which he had been per-

---

1. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because Cochran brought a claim under the ADA. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

mitted to use at EJSP. Upon arriving at Bayside, Cochran requested that the DOC return his cane, and alleges that he did not receive his cane until June of 1997, nine months after his arrival there. The DOC disputes this, asserting that Cochran was denied access to his walking cane only during an institutional State of Emergency following the murder of a corrections officer by an inmate. In the posture of summary judgment, we must accept Cochran's version.

At Bayside, the DOC also refused to let him possess a "talking watch," which audibly states the time, and a useable lock to secure his personal belongings. After arriving at South Woods, where he is now an inmate, Cochran was permitted to possess all the articles that he claims were denied to him at EJSP and Bayside. He makes no claims about conditions in South Woods. The heart of his case is the denial of these specific items for a discrete period of time at EJSP and Bayside.

In 1994, Cochran filed suit *pro se* against the DOC, alleging that it had violated Title II of the ADA. *See* 42 U.S.C. § 12132. Subsequently, the court appointed an attorney for him. Thereafter, the DOC moved for summary judgment, claiming that the Title II claim violated the Eleventh Amendment of the Constitution. The district court stayed the motion pending the outcome of the Supreme Court's decision in *Board of Trustees University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). The DOC then made a second motion for summary judgment which the district court granted. After the district court's deci-

sion, the Supreme Court decided *Tennessee v. Lane*, holding that Title II of the ADA, as it applies to classes of cases implicating the fundamental right of access to courts, constitutes a valid exercise of Congress' § 5 authority to enforce guarantees of the Fourteenth Amendment. 124 S.Ct. at 1994. Cochran now appeals.[2]

## II.

The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The statute prohibits discrimination against individuals with disabilities in the areas of employment (Title I); public services, programs and activities (Title II); and public accommodations (Title III). *See Lane*, 124 S.Ct. at 1984.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." § 12132. It provides also that "[a] State shall not be immune under the eleventh amendment [sic] to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." § 12202.

The Eleventh Amendment of the Constitution bars individuals from suing States for monetary relief based on violations of federal law. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54, 116 S.Ct.

---

**2.** Our review of a district court's grant of summary judgment is plenary. *See Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir.2003). We assess the record using the same summary judgment standard that guides district courts. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d

271, 278 (3d Cir.2000). To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.

1114, 134 L.Ed.2d 252 (1996). There are two exceptions to Eleventh Amendment Immunity: (1) when a State specifically consents to being sued; or (2) when Congress abrogates immunity through legislation. *Id.* at 55–56, 116 S.Ct. 1114. To determine whether Congress' abrogation for a specific claim is proper, it is necessary to ask two questions: whether Congress: (1) unequivocally expressed its intent to abrogate the immunity; and (2) acted "pursuant to a valid exercise of power." *Id.* (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)).

Here, New Jersey has not consented to being sued. We must therefore decide whether Congress properly abrogated Eleventh Amendment Immunity by operation of Title II under the facts alleged here.

To decide this, the Court in *Boerne* provided a road map that we must follow. The first step in the *Boerne* analysis is to "identify with some precision the scope of the constitutional right at issue." *Garrett,* 531 U.S. at 365, 121 S.Ct. 955. Second, the court must examine whether Congress "identified a history and pattern of unconstitutional employment discrimination by the States against the disabled." *Id.* at 368, 121 S.Ct. 955. Third, if (and only if) there is a pattern of unconstitutional conduct on the part of the State, the court determines whether the abrogation constitutes a proportionate response to the constitutional violation. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank,* 527 U.S. 627, 646, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999).

## III.

In *Garrett,* the Court applied the *Boerne* test to Title I of the ADA, the provision dealing with employment discrimination, and held that the Eleventh Amendment bars private suits for money damages for State violations of Title 1. 531 U.S. at 374, 121 S.Ct. 955. The Court reasoned that Congress' exercise of its prophylactic § 5 power was unsupported by a relevant history and pattern of constitutional violations by States against disabled individuals in the workplace. "Neither the ADA's legislative findings nor its legislative history reflected a concern that the States had been engaging in a pattern of unconstitutional employment discrimination." *Lane,* 124 S.Ct. at 1987 (citing *Garrett,* 531 U.S. at 368, 374, 121 S.Ct. 955). Title I's broad remedial scheme was deemed inadequate and inappropriate to prevent unconstitutional discrimination in public employment. In *Garrett,* the Court left open the question of whether the Eleventh Amendment bars private suits for money damages for violations of Title II of the ADA.

In *Tennessee v. Lane,* the Court answered this question. It decided that Title II of the ADA, as it applies to classes of cases implicating the fundamental right of access to courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment. 124 S.Ct. at 1994. In *Lane,* two paraplegics, Lane and Jones, alleged that they were unconstitutionally denied access to a Tennessee State court building because of their disabilities. *Id.* at 1979. Because there was no elevator in the courthouse, Lane had to crawl up to a second floor courtroom to answer his criminal charges. Jones, a court reporter, was unable to gain access to the second floor courtroom and, as a result, lost work.

Lane and Jones filed suit against the State, the defendant moved to dismiss and the district court denied the motion. On appeal, the Court of Appeals for the Sixth Circuit, sitting *en banc,* remanded *Lane* for further proceedings, having interpreted *Garrett* to bar private ADA suits against

States based on equal protection but not those that rely on due process. The Court granted certiorari.

In *Lane,* the Court easily answered the predicate question of whether Congress unequivocally expressed its intent to abrogate Eleventh Amendment Immunity. 124 S.Ct. at 1985. The ADA specifically provides that: "[a] State shall not be immune under the eleventh amendment [sic] to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. The question that remained was whether "Congress had the power to give effect to its intent." *Lane,* 124 S.Ct. at 1985. The Court used the tripartite *Boerne* test to answer this inquiry.

To satisfy the first step of the *Boerne* inquiry, the Court identified a multitude of rights that Congress sought to enforce when it enacted Title II, protected by the Equal Protection Clause of the Fourteenth Amendment as well as the Due Process Clause of the Fourteenth Amendment. *Id.* at 1988. These right include: (1) prohibition of irrational disability discrimination; (2) the right of access to the courts; (3) the right to a "meaningful opportunity to be heard;" (4) the right to trial by a jury composed of a fair cross section of the community. *Id.*

Next, the Court identified a significant history and pattern of unequal treatment for disabled individuals' access to public services in general, *id.* at 1989, and reasoned that:

[t]he conclusion that Congress drew from this body of evidence is set forth in the text of the ADA itself: "Discrimination against individuals with disabilities persists in such critical areas as ... education, transportation, communication, recreation, institutionalization, health services, voting and access to public ser-

vices." 42 U.S.C. § 12101(a)(3). This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provisions of public services and access to public facilities was an appropriate subject for prophylactic legislation.

*Id.* at 1992.

Finally, under prong three of the *Boerne* test, the Court had to decide whether Title II was an appropriate response to this history and pattern of unequal treatment. It held that the statute was a proper response, limiting its holding to cases implicating the fundamental right of access to the courts. "Nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole.... Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further." *Id.* at 1992–1993.

The Court concluded that "Title II's requirement of program accessibility is congruent and proportional to its object of enforcing the right of access to the courts." *Id.* at 1993. The Court explained that the remedy chosen by Congress is a limited one that requires only "reasonable modifications." *Id.* These modifications can be accomplished in a number of ways and would not impose an undue financial or administrative burden on the States. *Id.*

After completing the *Boerne* three-step inquiry, the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' section 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 1994. The Court was cautiously deliberate in limiting its holding to cases impli-

cating access to the courts, indicating that an individual analysis would have to be performed for subsequent Title II cases involving a different scenario.

## IV.

Five months after *Lane* was handed down, the Court of Appeals for the Eleventh Circuit refused to extend its teachings in *Miller v. King,* 384 F.3d 1248 (11th Cir.2004). Like the case at bar, this was a prison case that involved an inmate with disabilities.

The court held that Congress did not properly abrogate the States' Eleventh Amendment Immunity under Title II in a case involving discrimination in the penal system. *Id.* at 1278. Miller was a paraplegic State prisoner who was housed in the "K-building," a disciplinary isolation section of the prison. *Id.* at 1253. He alleged, *inter alia,* that: the cells were too small; the prison staff neglected to remove the bed for more mobility; the showers and toilets were not wheelchair-accessible; the prison staff had ignored his medical complaints; and, he had been denied basic privileges provided to able-bodied inmates. Because the "K-building" was so confined, prison policy called for beds to be removed daily so that wheelchair-bound prisoners could move around. *Id.*

The Eleventh Circuit applied the teachings of *Boerne* and *Lane.* In the first step of the *Boerne* inquiry, the court noted that "[b]oth Miller and the defendants agree that the only right at issue in this particular case is Miller's Eighth Amendment right to be free from cruel and unusual punishment." *Id.* at 1272. It concluded that "Title II in its entirety satisfied *Boerne*'s step-two requirement that it be enacted in response to a history and pattern of States' constitutional violations." *Id.* (finding that *Lane* identified a significant history and pattern of disability dis-

crimination for all types of public services, not just for cases involving access to the courts).

When applying the third step of the *Boerne* inquiry, the court juxtaposed obligations under Title II with prohibitions under the Eighth Amendment and rejected Miller's position, explaining that "Title II, as applied to prisons, would substantively and materially rewrite the Eighth Amendment." *Id.* at 1273. Title II imposes a positive obligation on authorities to accommodate individuals with disabilities; conversely, the Eighth Amendment imposes a negative obligation on authorities to abstain from "cruel and unusual punishment." *Id.* at 1274. The court stated that "Title II is not tailored to provide prophylactic protection of the Eighth Amendment right; instead it applies to any service, program, or activity provided by the prison. . . ." *Id.* In applying the third prong of the *Boerne* inquiry to the facts before it, the court concluded that "Title II of the ADA, as applied in *this* prison case, does not validly abrogate the States' sovereign immunity. . . ." *Id.* at 1275 (emphasis added). We are impressed by the court's analysis.

## V.

We now apply the tripartite *Boerne* test to our case and consider the teachings of *Lane* and *Miller* to decide whether Congress properly abrogated the States' sovereign immunity in this specific prison context. In the first step of the *Boerne* analysis, we identify the scope of the constitutional right at issue. Cochran has alleged only the right to be free from invidious discrimination protected by the Equal Protection Clause of the Fourteenth Amendment. As the Court in *Lane* noted, Title II of the ADA enforces the Equal Protection Clause's "prohibition on irrational disability discrimination," as well as

"a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." 124 S.Ct. at 1988. One area targeted by Title II is "unequal treatment in the administration of . . . the penal system." *Id.* at 1989.

The second step of the *Boerne* analysis requires us to decide whether Title II was enacted in response to a history and pattern of constitutional violations by the States. Like the Eleventh Circuit in *Miller*, we conclude that "*Lane* considered evidence of disability discrimination in the administration of public services and programs generally, rather than focusing only on discrimination in the context of access to the courts, and concluded that Title II in its entirety satisfies *Boerne*'s step-two requirement that it be enacted in response to a history and pattern of States' constitutional violations. We are bound to that conclusion as to step two." *Miller*, 384 F.3d at 1272 (citing *Lane*, 124 S.Ct. at 1992).[3]

The third step of the *Boerne* analysis requires us to analyze whether Title II is an appropriate response to the foregoing history and pattern of unconstitutional treatment. As did the Eleventh Circuit in *Miller*, we find this step most troubling. Unlike *Miller*, however, which analyzed the congruence and proportionality of Title II's remedies to claims rooted in the Eighth Amendment, we analyze the congruence and proportionality of Title II's remedies to claims rooted in the Equal Protection Clause of the Fourteenth Amendment.

■ Before we proceed, however, we must recognize that prison administration is a task that has been committed to the responsibility of the legislative and executive branches. Separation of powers considerations counsel a policy of judicial restraint in prisoners' rights cases. *Turner*, 482 U.S. at 85, 107 S.Ct. 2254. In *Turner*, the Court held that "when a regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254. It reasoned that subjecting prison officials to an inflexible strict scrutiny analysis would hamper their ability to anticipate security problems and distort the decision-making process. *Id.*

■ *Turner* set forth several factors it deemed relevant in evaluating the reasonableness of prison regulations: (1) whether there is a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; and (3) the impact that the accommodation of the asserted constitutional right will have on guards and on the allocation of prison resources generally. *Id.*

## VI.

■ We now analyze the congruence and proportionality of Title II's remedies to claims based in the Equal Protection Clause of the Fourteenth Amendment in this case. In light of *Turner*'s policy of judicial restraint in prisoners' rights cases, we conclude that Title II's remedies are not congruent and proportional to the specific claims brought here under the Equal Protection Clause in the context of Cochran's allegations against the DOC.

---

**3.** Thus, we have no difficulty with the line of cases described in the dissenting opinion on pages 6 and 7 of its typescript that support both the majority and the dissenting view that Title II in its entirety satisfies *Boerne*'s step-two requirement. It is in the third step that the majority and the dissent part company.

### A.

We begin by describing the remedies afforded by Title II that proscribe the exclusion of a "qualified" disabled prisoner from any "services, programs, or activities" of a public entity. *Miller*, 384 F.3d at 1266. Title II applies to any "service, program, or activity provided by the prison, whether educational, recreational, job-training, work in prison industries, drug and alcohol counseling, or a myriad of other prison services, programs, and activities...." *Id.* Title II, however, does not require States to employ any and all means to make a program available, but requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided.... *Lane*, 124 S.Ct. at 1993 (citing 42 U.S.C. § 12131(2)).

### B.

We next define the scope of the Equal Protection Clause of the Fourteenth Amendment. This provision is essentially a direction that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Generally, the Equal Protection Clause is not violated if the State's classification is rationally related to a legitimate state interest. *Id.* at 439–440, 105 S.Ct. 3249. If, however, a State classifies on the basis of race, alienage or national origin or impinges upon a fundamental right such as the right to vote or the right to travel, the classification is subject to strict scrutiny analysis. *See id.* at 440, 105 S.Ct. 3249. All other classifications are subject to the rational basis test.

### C.

Although Cochran alleges a violation of his right to equal protection of the law, these facts do not rise to a violation of any fundamental right. Because the DOC's classification does not involve race, alienage or national origin and does not affect one of Cochran's fundamental rights, the DOC's classification should be upheld if it is rationally related to a legitimate state interest. Here, there could be rational reasons for most of the DOC's actions. The DOC could have rationally regulated Cochran's access to his walking cane because it was an object that could have been hand-crafted into a "shiv" or knife-like weapon. The material utilized in constructing a talking book and special tape player could also have been so converted. Sounds emanating from the talking watch could have been disruptive to other inmates. There does not appear to be a rational basis for the DOC's denial of the useable lock. Denial of a useable lock without more, however, is merely *de minimus* and does not rise to the level of a violation of the Equal Protection Clause.

We believe that Title II's obligation to include "disabled" prisoners in all "services, programs, or activities" conflicts with the States' right to impose classifications on disabled prisoners as long as these classifications pass muster under the Equal Protection Clause. Furthermore, Title II conflicts with *Turner's* policy of giving prison officials wide latitude to create prison policies and anticipate security problems. If a prison official is obligated under Title II to make all "services, programs, or activities" accessible to all disabled individuals, that official would be impeded in his ability to make an individual assessment of what is rational and safe in the prison context. Title II's mandate would also prevent an official from making classifications amongst prisoners that are rationally related to a legitimate government interest.

The ADA affects far more state prison conduct and prison services, programs,

and activities than the Equal Protection Clause protects. To uphold Congress' abrogation of Eleventh Amendment Immunity in this specific prison context would allow Congress to "rewrite the Fourteenth Amendment law laid down by this Court in *Cleburne....*" *See Garrett* 531 U.S. at 374, 121 S.Ct. 955. Therefore, Title II of the ADA, as applied here, does not validly abrogate the States' sovereign immunity and cannot be enforced against the State of New Jersey or the DOC in a lawsuit for monetary damages.

## VII.

We have no difficulty in distinguishing this case from *Lane.* Unlike the constitutional right asserted here, access to the courts is a fundamental right. The Court noted in *Lane* that "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard in its courts." 124 S.Ct. at 1994 (quoting *Boddie v. Conn.,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). A State's robust due-process obligation to provide meaningful access to the courts is much more expansive than the wide latitude a State enjoys in equal protection cases that do not involve a suspect classification or a fundamental right. A State may treat similarly situated individuals differently so long as the classification meets the rational basis test. We decide that the DOC met the test here. Because these cases are always fact-specific, we might have a different situation if disabled prisoners were being denied a fundamental right like the plaintiffs in *Lane.*

\*　\*　\*　\*　\*　\*

Enactment of the ADA represents Congress' judgment that there should be "a comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress is the final authority as to desirable public policy, but to authorize private individuals to recover money damages against New Jersey, the remedy imposed by Congress must be congruent and proportional to the targeted violation.

These requirements are not met here because Title II's affirmative duty to accommodate Cochran's asserted disability needs is not congruent and proportional to New Jersey's wide latitude in making classifications among prisoners that are rationally related to a legitimate government interest. Under these circumstances, § 5 of the Fourteenth Amendment "does not so broadly enlarge congressional authority." *Garrett,* 531 U.S. at 357, 121 S.Ct. 955.

We therefore hold that under the facts of this case the Eleventh Amendment precludes a claim for damages against New Jersey under Title II of the ADA. The judgment of the district court will be affirmed.

SCIRICA, Chief Judge, dissenting.

Oliver Cochran contends the New Jersey Department of Corrections discriminated against him in violation of Title II of the Americans with Disabilities Act, requiring us to determine whether Title II is a valid exercise of Congress' authority to abrogate New Jersey's sovereign immunity under § 5 of the Fourteenth Amendment. In *Tennessee v. Lane,* the Supreme Court reiterated that Congress has the power to enact prophylactic measures in response to difficult and intractable problems of discrimination, such as the unconstitutional treatment of disabled persons. 541 U.S. 509, 124 S.Ct. 1978, 1993, 158 L.Ed.2d 820 (2004). To the extent Title II is prophylactic, the question is whether it is "congruent and proportional" to the problem Congress sought to remedy. Here, Congress documented a pattern and

practice of irrational discrimination against disabled persons and prisoners, and in response, exercised its prerogatives under § 5 to establish a prophylactic remedy. Because I believe Title II is a valid exercise of Congress' power with respect to irrational discrimination against disabled prisoners, a congruent and proportional response, I respectfully dissent.

## I.

As the majority sets forth, the three-part *City of Boerne v. Flores* framework governs whether § 5 legislation constitutes an appropriate remedial measure or whether it impermissibly works a "substantive change in the governing law." 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The majority finds fault with Title II under the third part of the *Boerne* analysis, stating that "Title II's remedies are not congruent and proportional to claims brought under the Equal Protection Clause." According to the majority, because a violation of Title II does not necessarily rise to the level of a violation of the Equal Protection Clause, the congruent and proportional test is not satisfied.

Title II may prohibit some conduct that would otherwise pass muster under the Equal Protection Clause. But this fact alone does not mean that Title II is an unconstitutional abrogation of States' sovereign immunity. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 88, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("That the ADEA prohibits very little conduct likely to be held unconstitutional, while significant, does not alone provide the answer to our § 5 inquiry."). The Supreme Court has affirmed that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nev. Dept. of Human Res. v. Hibbs*, 538 U.S.

721, 727–28, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (upholding the Family Medical Leave Act as a valid exercise of Congress' § 5 power to combat unconstitutional sex discrimination, notwithstanding the apparent constitutionality of the State's leave policy); *see also City of Boerne v. Flores*, 521 U.S. 507, 518, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'") (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)); *Fitzpatrick*, 427 U.S. at 455, 96 S.Ct. 2666 (upholding Congress' power to proscribe facially constitutional voting requirements in order to combat racial discrimination). Congress' § 5 power is a "broad power indeed." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 732, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (citing *Ex parte Va.*, 100 U.S. 339, 346, 25 L.Ed. 676 (1880)); *see also Boerne*, 521 U.S. at 517, 117 S.Ct. 2157 (1997) ("It is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference.") (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)). With respect to Title II, *Lane* held that it was "an appropriate subject for prophylactic legislation" in light of the "extensive record of disability discrimination that underlies it[.]" 124 S.Ct. at 1992.

That said, Congress' § 5 power is not boundless—"[w]hether Congress' abrogation of a State's sovereign immunity is proper depends upon whether its proposed remedial and preventative measures work a 'substantive change in the governing

law.' " *Lane,* 124 S.Ct. at 1986 (citing *Boerne,* 521 U.S. at 519, 117 S.Ct. 2157). This is determined by whether the § 5 legislation exhibits "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Lane,* 124 S.Ct. at 1986 (citing *Boerne,* 521 U.S. at 520, 117 S.Ct. 2157). The Court has recognized that "the line between remedial legislation and substantive redefinition is 'not easy to discern,' and that 'Congress must have wide latitude in determining where it lies.' " *Lane,* 124 S.Ct. at 1986 (quoting *Boerne,* 521 U.S. at 519–520, 117 S.Ct. 2157).

In applying the "congruence and proportionality" test, the critical relationship is between the scope of the remedy and the evidence of the States' unconstitutional conduct to which it is directed.[4] *See Fla. Prepaid Postsecondary Ed. Expense Bd. v. Coll. Sav. Bank,* 527 U.S. 627, 646–47, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (holding remedy unconstitutional because its scope was incongruous to the scant history of unconstitutional state action); *Kimel,* 528 U.S. 62, 88–90, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (holding Age Discrimination in Employment Act unconstitutional because its remedy was not proportional to the problem as documented by the evidence in the legislative record).

In *Board of Trustees of University of Alabama v. Garrett,* the Court held that Title I of the ADA exceeded Congress' § 5 power because Congress did not have before it sufficient evidence of unconstitutional state discrimination against disabled employees. 531 U.S. at 368, 374, 121 S.Ct. 955.[5] The Court suggested that even "were it possible to squeeze out of out of these examples a pattern of unconstitutional discrimination by the States," the scope of Title I's remedy would likely have been incongruously broad. *Id.* at 372, 121 S.Ct. 955. By contrast, the Court in *Lane* found that in passing Title II, Congress had before it sufficient evidence of the history and pattern of the States' constitutional violations of disabled persons. *Lane,* 124 S.Ct. at 1992 (holding that the legislative record "makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation").

Under the existing case law, and *Lane* in particular, it is not sufficient to find that Title II proscribes some conduct that otherwise would pass Equal Protection muster. Rather the question is whether Title II's remedy as it applies to disabled prisoners is congruent and proportional to the evidence of harms that Congress sought to remedy.

### A. Evidence

In assessing whether Title II is a valid exercise of § 5 power, we take account of the large body of evidence the Court identified in *Lane* that satisfied step two of the *Boerne* analysis. In addition, we consider the congruity of Title II's remedy to specific evidence regarding States' unconstitutional discrimination against disabled prisoners. *See Lane,* 124 S.Ct. at 1993

---

4. In assessing the third step of *Boerne, Lane* employed an "as applied" approach, limiting the scope of its analysis to the class of cases implicating the accessibility of judicial services. *Id.* at 1993, 1999. Following *Lane,* I would limit the scope of the analysis to the class of cases implicating irrational discrimination against disabled prisoners.

5. The "overwhelming majority" of evidence that Congress had before it related to "the provision of public services and public accommodations, which areas are addressed in Titles II and III[.]" *Garrett,* 531 U.S. at 371, n. 7, 121 S.Ct. 955.

(examining congruity of remedy with respect to specific evidence of unequal treatment of disabled persons in the administration of judicial services).

In *Lane*, the Court specifically called attention to evidence of States' discrimination against disabled prisoners. *Lane* noted that decisions of lower courts "document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including *the penal system* [.]" 124 S.Ct. at 1989 (emphasis added). In support of this observation, the court cited three cases, *id.* at 1989, n. 4: *LaFaut v. Smith*, 834 F.2d 389, 394 (4th Cir.1987) (paraplegic inmate unable to access toilet facilities); *Schmidt v. Odell*, 64 F.Supp.2d 1014 (D.Kan.1999) (double amputee forced to crawl around the floor of jail); and *Key v. Grayson*, 179 F.3d 996 (6th Cir.1999) (deaf inmate denied access to sex offender therapy program allegedly required as precondition for parole).

In addition, Congress had before it considerable evidence regarding discrimination in the provision of public services, including the treatment of disabled persons in prisons and jails. *See Garrett*, 531 U.S. at 391–424, 121 S.Ct. 955 (Appendix C to Justice Breyer's dissent): (citing Alaska 00055) ("jail failed to provide person with disability medical treatment"); (citing IL 572) ("deaf people arrested and held in jail overnight without explanation because of failure to provide interpretive services"); (citing MD 00787) (public libraries, state prison, and other state offices lacked [telecommunications for the deaf] ); (citing NM 01091) ("prisoners with developmental disabilities subjected to longer terms and abused by other prisoners in state correctional system"); (citing North Carolina 01161) ("police arrested and jailed deaf person without providing interpretive services").[6]

The United States as Intervenor cites several other cases illustrating a pattern of unequal treatment of disabled prisoners.[7] *See, e.g., Kiman v. N.H. Dep't of Corr.*, 301 F.3d 13, 15–16 (1st Cir.2002) (recognizing inmate's claim for denial of accommodations for Lou Gehrig's disease); *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) (enjoining California's failure to conduct parole hearings in a manner in which disabled inmates, including the visually impaired, could participate); *Bradley v. Puckett*, 157 F.3d 1022, 1025–1026 (5th Cir. 1998) (holding amputee inmate stated Eighth Amendment claim regarding allegations for state prison's alleged failure to provide adequate bathing facility); *Parrish v. Johnson*, 800 F.2d 600, 603, 605 (6th Cir.1986) (holding paraplegic prisoners were entitled to damages for state prison guard's assault of them with a knife and forcing them to sit in their own feces); *Kaufman v. Carter*, 952 F.Supp. 520 (W.D.Mich.1996) (holding Title II claim survived summary judgment where amputee was allegedly hospitalized after fall in inaccessible jail shower in county prison); *Bonner v. Ariz. Dep't of Corr.*, 714 F.Supp. 420 (1989) (holding that deaf, mute, and vision-impaired inmate had constitutional right to a sign language interpreter where state prison had denied communication as-

---

6. Evidence was also presented to the House and Senate Subcommittees that called attention to the "[i]nadequate treatment and rehabilitation programs [afforded the disabled] in penal and juvenile facilities," and the "[i]nadequate ability to deal with physically handicapped accused persons and convicts (e.g., accessible jail cells and toilet facilities)."

U.S. Comm'n on Civil Rights, *Accommodating the Spectrum of Individual Abilities*, Sept. 1983, App. A at 168.

7. Many of these cases came after the passage of the ADA and thus were not before Congress.

sistance in disciplinary proceedings, counseling sessions, and medical treatment).

### B. Remedy

Title II requires reasonable measures or modifications to allow disabled inmates to participate in prison services, programs, and activities. 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12112(b)(5) (defining discrimination to include the failure to provide "reasonable accommodations"). This remedy only applies when the person seeking modification or accommodation is otherwise eligible for the service. *Lane,* 124 S.Ct. at 1993. Title II does not require a fundamental alteration to the nature of the service provided, and a prison need not employ any and all means to accommodate. *Id.* Furthermore, a public entity is not required to take actions that would result in "undue financial and administrative burdens." *Lane,* 124 S.Ct. at 1994 (citing 28 C.F.R. §§ 35.150(a)(3)). Title II only requires modification or accommodation where it is reasonable to do so. By requiring only reasonable modifications, Title II's remedy is limited, lending support to the conclusion that it is congruent and proportional response to the harm it seeks to prevent.

The Supreme Court has addressed the Equal Protection rights of disabled persons in *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *Cleburne,* the Court held that a legislative classification based on disability does not violate the Equal Protection Clause if the classification is rationally related to a legitimate state interest. Furthermore, the Court has addressed the competing interests and balance between the responsibility to administer prisons and jails and prisoner's constitutional rights. In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254; *see also Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("prisoners [should] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration"). In applying this standard to a given case, a court considers four factors: whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," "whether there are alternative means of exercising the right that remain open to prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and "the absence of ready alternatives." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254.

Like *Cleburne* and *Turner,* Title II balances the interests of disabled inmates and the burden on prison administration. Just as *Turner* requires consideration of the impact on prison resources, Title II's reasonable modification requirement allows for consideration of cost and other burdens as well as whether the accommodation affects a fundamental alteration in the nature of the service. Just as *Turner* considers available alternatives, Title II considers whether there are "other methods for meeting the requirements." 28 C.F.R. § 35.150(b).

Title II not only requires a balancing of interests similar to *Cleburne* and *Turner,* but those cases inform what constitutes a reasonable measure under Title II. In a Title II case, a court should consider whether the government would be obligated to accommodate under *Cleburne* and *Turner,* taking account of the state's peno-

logical, financial, and administrative interests. What is reasonable under Title II bears a relation to whether the government would be required to accommodate under *Cleburne* and *Turner*. This suggests that Title II, as it applies to irrational discrimination against disabled prisoners, does not substantively rewrite the Fourteenth Amendment. That said, while *Cleburne* and *Turner* inform the Title II analysis, they do not necessarily control it. There may be instances in which Title II calls for measures that *Cleburne* and *Turner* would not. In my view, this constitutes the prophylactic element of Title II, which should be assessed under the "congruent and proportional" test.

### C. Remedy Congruent and Proportional to Evidence

I believe Title II's remedy is congruent and proportional to the substantial body of evidence of states' unconstitutional treatment of disabled prisoners, as well as the evidence *Lane* held satisfied step two of the *Boerne* analysis for Title II as a whole. Judged against this evidence, Title II's required reasonable modifications to programs, services and activities is a reasonable prophylactic measure, appropriately targeted to a legitimate end.

As noted, the unequal treatment of disabled prisoners has a substantial history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination. *Lane*, 124 S.Ct. at 1993. "Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this 'difficult and intractable proble[m]' warranted 'added prophylactic

measures in response.'" *Id.* (quoting *Hibbs*, 538 U.S., at 737, 123 S.Ct. 1972). Also relevant are *Lane*'s observations regarding the limited scope of Title II's remedy as applied to accessibility of judicial services:

> But Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs. It requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service. As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways.

*Lane*, 541 U.S. 509, 124 S.Ct. 1978, 1993–94, 158 L.Ed.2d 820. Title II does not require prisons to employ any and all means to make available its programs, services, and activities. Nor does it require prisons to make those activities available to a disabled inmate who would otherwise not be eligible to participate. Title II only requires reasonable modifications, taking into account considerations of cost and other burdens, which a prison can satisfy in a number of ways, and which would not fundamentally alter the nature of the service provided. In short, it is not "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Boerne*, 521 U.S. at 532, 117 S.Ct. 2157.[8]

---

8. I believe this case is distinguishable from the Eleventh Circuit's recent decision in *Miller v. King*, 384 F.3d 1248 (11th Cir.2004). In *Miller*, the plaintiff, a paraplegic inmate, alleged that the Georgia State Prison's failure to make accommodations for his disability constituted a violation of Title II, as applied to claims rooted in the Eighth Amendment. *Id.* at 1272. The court rejected the claim but limited its holding to the intersection of Title II and the Eighth Amendment. *Miller* recognized that the Eighth Amendment (punish-

## Conclusion

Title II's remedy, as applied to irrational discrimination against disabled prisoners, is congruent and proportional to the evidence of the history and pattern of States' discrimination against disabled persons and disabled prisoners.

I would remand to the District Court to evaluate the merits of Cochran's Title II claim.

ment) bears little relation to Title II's application to a disabled prisoner's participation in prison services, programs, or activities. *Id.*

Cochran's claims, by contrast, are not rooted in the Eighth Amendment.